JURISDICTION
Albert A. Blinder, J.
This is the decision after trial on two tort claims, tried 'jointly, with separate judgments to he entered pursuant to an order of the court, consented to by the parties herein. (CPLB 602, ¡subd. [a].) The issues of liability and damages were bifurcated by order of the court upon consent of both sides. (CPLB 4011.) The court therefore now only decides liability.
Claim No. 55058 was filed in the Clerk’s office on May 31, 1972. It is a claim to recover damages of $501,400 for the personal injuries sustained by Gladys Homere and $50,000 damages for loss of services by Andre Homere.
Claim No. 55103 was filed on June 9,1972 for $50,000 damages for the personal injuries sustained by Anna Stillman and $5,000 for loss of services by Max Stillman.
*973 FACTS
On March 20, 1972, at approximately 8:00 in the morning, Andre Homeire dropped his wife, Gladys, at .the Aqueduct Station ■of the “ IND ” ¡subway in Queens. Gladys walked upstairs to the station platform and waited for her train, ¡standing, as was her habit, 2 to 3 feet from the edge. Suddenly, without warning, ■she was seized from the .back and pushed forward onto the tracks. Gladys lost conciousness. When ¡she came to, she was on the platform where people assisted her until she was removed to a hospital.
On the same morning, Anna Stillman was on an “ IND ” subway train on her way to work. Anna was crocheting as her train pulled into the Aqueduct Station. .She remembers that’.the train was at .the station platform for about five minutes with the doors closed. As Anna sat with her neighbors, she noticed a man standing by ¡the door. When the do oris to the train opened, the man ran towards her and, without ¡saying a word, raised his hand and struck her on the right side of her head.
The assailant of both ¡Gladys Homere and Anna Stillman and three other women, that morning, was one Melvin Samuels. Mr. Samuels, it is conceded, was released that morning, some minutes before the assaults, from Pilgrim State Hospital. He was discharged at the hospital and thereupon taken by hospital bus to New York City. He was dropped at the Aqueduct Station with instructions that he was !to go to the New York City Social Services office, by subway, to obtain a room in which he was to reside. In ¡addition, an appointment had been made for his treatment in 'an after-care clinic. It is conceded by the State in its brief that ‘ ‘ the patient had a history of mental ¡care and treatment. He committed many acts of assault
ISSUES
The issue is .whether the State can be held liable in negligence for the release of Melvin ¡Samuels on the morning of the assaults.
The defendant contends that the State cannot be so held because Mr. Samuels’ release was an exercise of medical judgment. This defense, common in cases similar to the matter at bar, is predicated on St. George v. State of New York (283 App. Div. 245, affd. 308 N. Y. 681). In the St. George case, Mr. Justice ¡Coon stated (p. 248): “ Thus the issue is narrowed to this: Are the doctors, or is the ¡State which employs them, legally responsible in damages for an honest error of professional judgment made by qualified and competent persons? We think this question must be answered in the negative. It *974 has been so held in malpractice cases of all types for years. (Warner v. Packer, supra; Pike v. Honsinger, 155 N. Y. 201; Kinsley v. Carravetta, 244 App. Div. 213, affd. 273 N. Y. 559.) Future human behavior is unpredictable, and it would place an unreasonable and unfair ¡burden upon the ¡State if it were to be held .responsible in damages for everything ¡that a person does after he hais been discharged or released from one of its State institutions, even though the release was through an error of judgment, unless there is something more present than is contained in this record. ’ ’
THE LAW
On February 7,1972, a “ Commission ” of three psychiatrists at Pilgrim State Hospital made a determination that Mr. Samuels was dischargeable as a patient.[1] That this determination was a medical decision is without doubt. The court therefore did not consider, as a factor regarding the “ Commission’s ” determination, that the assailant had been discharged and readmitted some 15 times in the ‘‘ revolving door ” of our State’s mental health institutions. The patient’s records contain innumerable entries relating to acts of aggression, clearly evincing that he was an extremely violent, assaultive man, who attacked females without reason, cause or justification. The law is that “ liability on the part of the iState does not arise if such medical judgment was, in fact, erroneous.” (Williams v. State of New York, 30 A D 2d 611, 612, citing St. George v. State of New York, 283 App. Div. 245, affd. 308 N. Y. 681, supra; Dennison v. State of New York, 28 A D 2d 608; Higgins v. State of New York, 24 A D 2d 147; Taig v. State of New York, 19 A D 2d 182. Also, see, Carlmo v. State of New York, 30 A D 2d 987.)
Therefore, for the ¡State to be liable, ¡something more must be present other than an honest error of professional judgment. (St. George v. State of New York, 283 App. Div. 245, 248, supra.)
We think that the “ something more ” required to hold the defendant liable is present in these claims.
The patient’s case was described by his treating psychiatrist as a “ ¡somewhat unusual case ”. So unusual that his discharge, the hospital decided, required an evaluation, not by his psy *975 chiatrist alone, hut by a “ Commission ” of three psychiatrists. This was “ [an] evaluation of the seriousness of his behavior.”
On February 23, 1972 (16 days after the “ Commission’¡s ” determination), Melvin Samuels had a violent incident. The hospital .records have the following entry: “picked up chair and started smashing windows, TV and throwing things, et cetera. Galled 318 for male help. ’ ’ 0-n the next day, the ¡records reflect that Mil". .Samuels refused to eat and more .significantly “ he refused to come out of camisole.”
The fact that the patient had to be put into a camisole is in itself highly ¡significant. The Mental Hygiene regulations, adopted pursuant to the Mental Hygiene Law .(formerly § 12, subd. 4),[2] specifically state that protective restraint “is to be employed only for satisfactory surgical or medical reasons, or to prevent a patient from injuring himself or others.” (14 NYCRR ¡23.1.)
The fact ¡that ¡Mr. Sameuls remained in restraint for a day and then refused to come out is also of interest, since it appears to be the regulation of the commissioner that no patient may be continuously kept in protective restraint for over two hours. (14 NYCRR 23.4.) These regulations are more than mere reflections of policy; they are presumably statements of treatment in accord with proper medical standards and should indicate the seriousness of protective restraint.
Notwithstanding the events of February 23 and 24, 1972, Mr. Samuels was discharged on March 20, 1972. Mr. ¡Samuels’ psychiatrist could not remember when he saw the patient after the date the “Commission” met :on February 7, 1972.[3] His only personal summary in the hospital records after that date was made on March 20,1972, after the patient was discharged.
We think it ¡was clearly negligent for the State to allow the discharge of this man without reconvening a “ Commission” to re-evaluate his case. The hospital had previously acknowledged the difficulty in evaluating his “ somewhat unusual case ” by referring it to a three-psychiatrist “ Commission.” The necessity for a ‘'Commission’s ” ¡re-evaluation is well fortified by the opinion of the claimants’ expert, who did not disagree with the medical decision made on February 7,1972.
The rule of law embodied in St. George v. State of New York (283 App. Div. 245, affd. 308 N. Y. 681, swpra) does not create an inflexible total immunity (¡see, for example, O’Neil v. State *976 of New York, 66 Misc 2d 936). Clearly, St. Gteorge v. State of New York (supra), is- distinguishable from the .claims at bar.
The circumstances of his discharge were also ignoble. The patient apparently was ¡simply dropped off at a subway station with instructions to go to the social services office to obtain quarters. The assailant was ¡an uneducated, borderline mental retardate. The testimony indicates that this method of discharge was the ¡standard procedure. Even though a patient was instructed to report in Manhattan, he or she (¡as most discharged patients that go to social ¡services in Manhattan) would be dropped off at the Aqueduct subway station in ¡Queens. The Mental Hygiene Department’s bus [4] would not take a patient into Manhattan .unless he or .she was being transferred to Manhattan State Hospital. A well-adjusted[1] individual would no doubt suffer some 'anxiety in these circumstances. One can imagine the effect upon a patient with Mr. Samuels ’ history of confinement for treatment in confronting, as he did, the subway, morning, ¡rush-hour crowds.
The court, however, does not base liability on the manner of his discharge as above described. (See Cameron v. State of New York, 37 A D 2d 46, affd. 30 N Y 2d 596.)
If is the court’s finding that the convening of the ‘1 Commission ” was an administrative act, and not an exercise of medical judgment.
Liability is therefore solely predicated on the State hospital’s negligent omission to obtain a “ Commission’s ” re-evaluation to determine if the assailant was ¡still ¡suitable for discharge, after the violent events of February 23 and 24, 1972 and the resulting wrongful discharge of the assailant which was the proximate cause of the injuries to the claimants, in a manner completely perceivable. (Cf. Underwood v. United States, 356 F. 2d 92.)
In Flaherty v. State of New York (296 N. Y. 342, 346), Judge Finn .stated: “ the law is clear; it is only in its application that difficulty is encountered. The State — just as apy other party (Court of Claims Act, § 8; L. 1939, oh. 860) —is responsible, in the operation and management of its schools, hospitals and other institutions, only for hazards reasonably to be foreseen, only for risks reasonably to be perceived.” In the case at bar, there is no question that the event complained of was foreseeable. The assailant’s previous readmissions to State hospitals invariably followed ¡assaults. (Cf. Higgins v. State of New York, 24 A D *977 2d 147, supra. See, also, Hilscher v. State of New York, 64 Misc 2d 368, 371.)
Having found liability, the Clerk of this court is directed to enter ¡separate interlocutory judgments in favor of the claimants against the defendant, the State of New York, on the initial issue of liability and further providing that the assessment of damages herein shall be heard at a time 'and place of which all counsel shall be notified, and that upon ¡rendition of a further decision with respect to ¡said damages, appropriate judgments shall be entered in these claims as will be directed.
Let interlocutory judgments be entered accordingly.

. It should be noted that the patient at this time was a voluntary one. There was no evidence adduced that prior to the convocation of the “ Commission” the patient had given notice, in writing, of his intention or desire to be discharged. See subdivision 1 of section 71 of the Mental Hygiene Law (now § 31.13, subd. [b]). Nor was such notice given at any time prior to the patient’s discharge.

. Now section 9.01 of the Mental Hygiene Law.

. See 14 NYCRR 23.2 (Restraint requires signed order of physician, giving reasons.)

. Which apparently was on its way to King’s County in the ease at bar.