Mary E. WILLIAMS, Special
Administratrix

v.

UNITED STATES of America.

No. CIV76–5017.

United States District Court,
D. South Dakota.

May 5, 1978.

Joseph Butler and Allen G. Nelson, Robert E. LaFleur, Rapid City, S. D., for plaintiff.

David V. Vrooman, U. S. Atty., Sioux Falls, S. D., for defendant.

## MEMORANDUM OPINION

BOGUE, District Judge.

This suit under the Federal Tort Claims Act is brought to recover for the wrongful death of Robert Williams. Mr. Williams was shot and killed by Alonzo Bush on May 3, 1975, the day following Bush's release from the Fort Meade, South Dakota Veterans Administration Hospital. Under all of the circumstances, examined in detail be-

low, we find that failure of the hospital to notify Meade County authorities of the discharge and release of Alonzo Bush was negligent and that such negligence was the proximate cause of Mr. Williams' death.

## FACTS

In June of 1973, while on parole in California, Alonzo Bush suffered a severe head injury. Following brain surgery, he received permission from the California Parole Board to come to South Dakota. He was first admitted to the Veterans Administration Hospital at Hot Springs, South Dakota on September 17, 1973. The admitting doctor's impressions on that date were that Alonzo Bush evidenced organic brain syndrome and a psychotic disorder. The doctor noted that Bush was disoriented and had "psychiatric disturbance."

In the two and one-half years following this initial contact Bush was in and out of VA hospitals a total of twenty-three times. The voluminous VA medical records show a consistent pattern of diagnoses of chronic brain syndrome, chronic alcoholism, and severe personality disturbance. During his stay at various VA facilities Bush was diagnosed again and again as "paranoid", "psychotic" and "schizophrenic." The records are filled with references to Bush's hostility, his defensiveness, his disorientation and his potential for violence. On several occasions, the records show, Bush had to be placed in the locked wards of VA hospitals because of violent behavior and threatened violence. At various times, VA officials discussed the possibility of having Bush committed.[1]

In January of 1975, while a patient at the VA hospital in Hot Springs, Bush wandered into the ward's television room and, without any provocation, attacked another patient. Bush was rough and abusive and force had to be used to restrain him. He was placed in the locked ward and his parole officer

was called. His parole officer, in turn, contacted the Fall River Sheriff who apprehended Bush at the hospital and jailed him. All of the above information became part of Bush's VA records.

By the end of January, Bush had been transferred to the alcohol treatment ward at the Human Services Center in Yankton, South Dakota. Counselors there found him hostile and noted his difficulty in getting along with other patients. Alonzo Bush was released from the hospital in Yankton on March 6, 1975. Five days later he appeared at the Fort Meade VA hospital. The Fort Meade medical records show that he was intoxicated. On the following day, March 12, Bush insisted on leaving the hospital. He was allowed to leave AMA (against medical advice) but on the following night, March 13, he returned. The Fort Meade records show that he was drunk and, according to the nurse on duty at admissions, he was loud and abusive. He accused various staff members of hating Indians. When the nurse asked his name and if he were a veteran he replied, "I am a boy scout." Then, without provocation, he attacked a staff member, wrestling him to the ground. Bush was told that if he did not settle down he would be placed in restraints. He continued to make verbal threats and was subsequently escorted out of the hospital by three members of the hospital's Protective Service.

On the following day, March 14th, Alonzo Bush was returned to Fort Meade by the police. The medical records reveal that "Instructions from this officer were to keep him in this hospital and if we [are] unable to do that . . . to notify the Police Department of this patient's departure." A later notation made that same day states, "Dr. Wells further instructed us to contain this patient even if he wrote an AMA letter—to accept it but not to honor it until the chief attorney notifies us."

---

1. Although we limit discussion in this opinion to instances of violent behavior occurring within the months just prior to the murder of Mr. Williams, it should be noted that VA records show that prior to January of 1975, Alonzo Bush initiated, threatened or was involved in several fights, threatened to kill members of his own family, made oral threats of violence toward hospital staff and police, threatened a VA doctor with a scissors when the doctor attempted to examine him and had an extensive arrest record.

Between March 14th and March 18th VA officials were much concerned about what to do with Alonzo Bush. A report signed by Wayne Christenson, the Administrative Assistant to the Chief of Staff of the hospital details these concerns; Bush was insisting that he be allowed to leave. At the same time, VA officials considered him to be "fairly dangerous." The District Counsel for the VA had advised that Bush had been "bouncing around the country hitting people." Yet, there was uncertainty about whether Bush would qualify for involuntary commitment under South Dakota law. The report concludes: "We will contact the doctor and if he decides to let the patient go, we will notify local authorities. We should document this."

Two VA doctors, Dr. Herman and Dr. Garlisi consulted on the matter. Dr. Garlisi subsequently conceded that at the time he attempted to convince Dr. Herman that Bush was not dangerous he was not aware of the unprovoked assault Bush had committed on a staff member a few days before although a report of the incident was part of the medical records and the records, in their entirety, were available to Dr. Garlisi. Nonetheless, it was determined that Bush did not qualify for commitment. On March 18th, Alonzo Bush left the locked ward of the Fort Meade VA Hospital.

The following evening Bush was arrested by the Meade County sheriff and jailed. That night, Bush attempted to set fire to the jail. A jailer was able to put out the fire and Bush was subsequently charged with criminal damage to property. Jail officials, however, could not control Bush and on March 25, 1975 they received permission from the VA to return him to the hospital at Fort Meade. The report of contact signed by Salvatore Valadez, Medical Administrative Specialist, states:

"This veteran is presently in jail there for assault and battery, disturbing the peace, and criminal damage to property. He has been having some 'fits' or something and they feel he needs care. [He has been brought here] with the understanding that if he is hospitalized he will be returned to the Meade County authorities when need for hospitalization is terminated."

At trial, Mr. Valadez clarified the meaning of this statement:

Mr. Valadez: Well this was the understanding—I want to clarify the return to the authorities. What I meant was that we would notify them. We are not permitted to release or turn [patients] back to the authorities . . . but we are permitted to notify them of his (sic) release.

\* \* \* \* \* \*

The Court: You intended to notify them and then turn him over to the sheriff when he got there?

Mr. Valadez: Right.

It was with this express understanding that Alonzo Bush was admitted to the hospital at Fort Meade. A notation to that effect was attached to the outside of his current file and Alonzo Bush was placed in the hospital's locked ward.

Several days later Bush requested that he be transferred from the locked ward to the alcohol treatment ward and, on the joint decision of Dr. Thomas Marvin and Dr. William Trumpe, the transfer was effected. Dr. Trumpe had not reviewed any of Alonzo Bush's medical records. He did not know about the March 13th attack on a staff member, about Bush's previous history of violent behavior or about prior diagnoses indicating that Bush was psychotic, paranoid or schizophrenic. Dr. Marvin was designated the treating physician. Dr. Marvin had consulted only Bush's current medical records and did know about the recent attack on a staff member. On the April 4, 1975 intake note Dr. Marvin stated:

About two weeks ago the patient appeared in the front lobby of the hospital intoxicated. Employees attempted to help him, however, Bush refused and became quite violent and struck one of the hospital personnel."

Observing Bush throughout the month of April, Dr. Marvin noted "Bush shows no genuine motivation regarding permanent sobriety."

Alonzo Bush went through the regular four week treatment program as would any patient who had come to Fort Meade for alcohol treatment. Near the end of that period, on April 28, 1975, a routine discharge staff meeting was held. Although Dr. Marvin was the treating physician and aware of at least some of Alonzo Bush's prior medical history, he was not present at the discharge staff meeting and he testified that he could not remember what, if anything, about Bush he told the staff members who handled the discharge. Dr. William Trumpe was the doctor in charge of the discharge staff meeting and it was he who authorized Alonzo Bush's release.

Dr. Trumpe testified that he had no knowledge of why Alonzo Bush had been placed on the hospital's locked ward and had never seen any medical records regarding Bush prior to discharging him with the exception of the records relating to the current admission of March 25, 1975. He testified that, at the time he authorized Bush's discharge, he did not know of the attack on a staff member which had taken place on March 13th. Dr. Trumpe testified that he had no knowledge of discussions conducted the month before regarding the possibility of seeking involuntary commitment of Alonzo Bush. He was not aware, at the time he authorized the discharge, of the report, available in Bush's files, which was prepared by Wayne Christenson, Administrative Assistant to the Chief of Staff, and which indicated that Bush was "fairly dangerous." He was not aware of that portion of the report indicating that the District Counsel for the VA had advised Mr. Christenson that Bush had been "bouncing around the country hitting people."

Dr. Trumpe testified that on April 28, 1975 when he authorized the discharge of Alonzo Bush he had no knowledge that Bush had completed the alcohol treatment program at the Human Services Center in Yankton, South Dakota less than two months before, although that information had been made part of the VA medical records. Having read none of the VA Hospital records of previous admissions, all of which were available to him, Dr. Trumpe did not know that Alonzo Bush had a history of violent behavior and had been diagnosed on numerous occasions as being "psychotic", "paranoid" and "schizophrenic". Dr. Trumpe testified that he had seen Bush only twice—once at the initial screening for admission to the alcohol program and once at the discharge meeting. His decision to release Bush was based on these two meetings and a fifteen minute scan of Bush's current records. Dr. Trumpe testified that he scanned the current records during the discharge staff meeting itself. He had never previously examined them. The discharge staff meeting lasted a total of approximately twenty minutes, according to Dr. Trumpe's testimony.

Dr. Trumpe and Dr. Marvin concluded that Alonzo Bush was not competent for VA purposes, that is, not competent to handle his finances. They knew him to be receiving a VA pension and to have been declared unemployable, yet no post-discharge arrangements whatever were made for Bush. Dr. Trumpe considered as adequate post-discharge planning Bush's own statement to the effect that he, Bush, would travel to California and find a halfway house there. Dr. Trumpe was aware, because of the note attached to Bush's file, that Meade County authorities were to be notified of Bush's release. Such notification, however, was the responsibility of the administrative staff and Dr. Trumpe did not consider it his responsibility to see that such notification was given. Mr. Valadez of the administrative staff testified that no such notification was, in fact, given.

On May 2, 1975, Alonzo Bush left the Veteran's Administration Hospital at Fort Meade. The Meade County Sheriff, John Eggar, testified that his office was not notified of Bush's release but that it had been his understanding that Bush was to be released to the sheriff's office. He testified that charges against Bush were pending. The Court finds on the basis of Sheriff Eggar's testimony that had notification been given, the Meade County Sheriff's office would have taken Alonzo Bush into custody on March 2, 1975 and would have held him for further court proceedings.

On May 3, the day following his release, Alonzo Bush approached three men who were standing outside of Bob's Sewing Center on Main Street in Rapid City, a business then owned and operated by Robert Williams. Bush was drunk, an altercation ensued, and one of the three men, Robert Williams, pushed Alonzo Bush away. Bush stumbled backwards and fell. He then got up, walked several feet away and told a woman passerby that "that white man over there is trying to kill me" and that he, Bush, was with the F.B.I. Bush then walked back toward the group of three men, pulled a revolver and shot Mr. Williams in the head. Mr. Williams died at a Rapid City hospital shortly thereafter.

## NEGLIGENCE

■ The Court notes at the outset that a hospital cannot be charged with the responsibility of insuring the physical safety of the public from all harmful acts committed by patients who have been discharged. Such a course of action would place an unreasonable burden on treating institutions. The Court also recognizes that any claim of negligence against a hospital must be considered in light of the elusive qualities of mental disorders and the likelihood that honest errors in judgment will, from time to time, occur. *See* e. g. *White v. U. S.,* 244 F.Supp. 127 (E.D.Va.1965).

■ Nonetheless, a hospital treating patients who have a history of behavior disorders is not, for that reason alone, shielded from liability in all instances when a patient it has released causes harm to others. VA hospitals have been held liable for negligent failure to properly inform a court of the potential danger to others posed by a patient the hospital has treated; *Hicks v. United States,* 167 U.S.App.D.C. 169, 511 F.2d 407 (1975) and for negligence in granting leave to a patient with a prior history of violent behavior without providing for proper supervision during that leave. *Merchants National Bank and Trust Co. of Fargo v. United States,* 272 F.Supp. 409 (D.N.D.1967). In *Homere v. State,* 79 Misc.2d 972, 361 N.Y.S.2d 820 (1974) a state hospital was held liable for failure to reconvene a discharge panel and to reevaluate the advisability of discharging a patient subsequent to the patient's display of violent behavior. In the present case, having agreed to notify the sheriff of the release of Alonzo Bush so that Bush, a man with a known propensity for violence, could be taken into custody, a duty was imposed upon the Fort Meade VA Hospital to exercise reasonable care under all the circumstances to see that such notification was provided.[2] We find that the defendant hospital was negligent in that it failed to exercise such care.

Reasonable care is "that degree of care which a reasonably prudent person [or institution] would have used under the same or similar circumstances." *Washington Hospital Center v. Butler,* 127 U.S.App.D.C. 379, 383, 384 F.2d 331, 335 (1967). The circumstances of this case demanded a particular high degree of care. In addition to the sheriff's request to be notified of Bush's release which, in and of itself, should have alerted the hospital to the possibility that

---

**2.** The statement that there is or is not a duty begs the essential question—whether the plaintiff's interests are entitled to legal protection against the defendant's conduct. It is therefore not surprising to find that the problem of duty is as broad as the whole law of negligence, and that no universal test for it ever has been formulated. It is a shorthand statement of a conclusion, rather than an aid to analysis in itself. It is embedded far too firmly in our law to be discarded, and no satisfactory substitute for it, by which the defendant's responsibility may be limited, has been devised. But it should be recognized that "duty" is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection.

There is little analysis of the problem of duty in the courts. Frequently it is dealt with in terms of what is called "proximate cause," usually with resulting confusion. In such cases, the question of what is "proximate" and that of duty are fundamentally the same: whether the interests of the plaintiff are to be protected against the particular invasion by the defendant's conduct. (Footnotes omitted.) *Hicks v. U. S.,* 167 U.S.App.D.C. 169, 181, 511 F.2d 407, 419 (1975) *quoting* Prosser, *Law of Torts,* ch. 9, pp. 325–26 (4th ed. 1971).

Bush might pose a danger to the public, the hospital knew that Bush had been arrested, that he had set fire to the jail, that authorities felt they could not control him and that Bush had been having "fits or something." Further, its own records (about which the hospital should have been informed) indicated that Bush had a strong propensity for hostile and violent behavior, that he had in the past made unprovoked attacks on an examining doctor and on a fellow patient, that he had been diagnosed as "psychotic", "paranoid" and "schizophrenic" at various times and that, only twelve days before, in the lobby of the very same hospital, had attacked a staff member and wrestled him to the ground.

Prosser has stated the standard of reasonable care under such circumstances:

".  .  . When the risk becomes a serious one, either because the threatened harm is great or because there is an especial likelihood that it will occur, reasonable care may demand precautions against 'that occasional negligence which is one of the ordinary incidents of human life and therefore to be anticipated.' " Prosser, *Law of Torts*, ch. 5, p. 171 (4th ed. 1971).

He has noted further that

".  .  . The defendant's special responsibility may arise because he is in a position to control the criminal himself and so is held to be under an obligation to do so, extending to anyone who may be injured by his failure to exercise reasonable care." Prosser, *Law of Torts, supra*, p. 175.

It is difficult to glean from the record exactly why the hospital failed to notify the sheriff. The doctors who testified stated that notifying the sheriff was an administrative task and that physicians took no part in such procedures. On the other hand, Wayne Christenson, administrative assistant to the chief of staff, stated that notification was a "combined effort of the ward team and medical administration." The ward secretary on the alcohol ward stated in a deposition received into evidence that notification was the responsibility of the processing department, a division of the administrative branch of the hospital. She testified that, although she sat in on the discharge staff meeting, she knew nothing of Bush's past and did not know why the sheriff wanted to be called. She did, however, know that notification was to be made because a note card to that effect had been attached to Bush's file. She testified that she called the processing department but was told by a secretary in processing that the instruction to notify the sheriff was probably related to an earlier admission. The secretary in processing, however, testified that no such note card was attached to Bush's file when she received it and that she had never been made aware of the sheriff's request.

Even without determining precisely what went wrong with the hospital's system for notification, it is apparent that the overall data dispensing procedures the hospital employed were faulty and that errors in patient care and discharge could easily occur. Old records were not adequately reviewed. Information about which the upper echelon of the administrative staff was aware, i. e. that Bush was "fairly dangerous" and had been "bouncing around the country hitting people," was not effectively reaching the medical staff in charge of releasing Bush. Nor was the information regarding the importance of notification of the authorities properly impressed upon the administrative staff members ultimately charged with calling the sheriff. Further, the hospital maintained no system of checks to insure that such notification had, in fact, been made. In short, hospital procedures were ineffective to protect against "that occasional negligence which is one of the ordinary incidents of human life and therefore to be anticipated," Prosser, *supra*, but which, in the exercise of reasonable care under the circumstances of this case, the hospital was bound to protect against.

### PROXIMATE CAUSE

In order to find that the defendant is liable to the plaintiff, the defendant's negligent act must be the proximate cause

of the plaintiff's injury. That is, the harm suffered must be found to be a foreseeable consequence of the act complained of. This does not mean, of course, that the precise events which occurred could, themselves, have been foreseen as they actually occurred; only that the events were within the scope of the foreseeable risk.

> " . . . it must appear that the injury was the natural and probable consequence of the negligence or wrongful act, and that it ought to have been foreseen in the light of the attending circumstances." *Hicks v. United States, supra,* 167 U.S.App.D.C. at 182, 511 F.2d at 420, *citing Milwaukee and St. Paul Railway Co. v. Kellogg,* 94 U.S. 469, 24 L.Ed. 256 (1896). *See also Pielke v. Chicago, Minneapolis and St. Paul Railway Co.,* 5 Dak. 444, 41 N.W. 669 (1889).

In addition, the negligent act must be a substantial factor in bringing about the harm. *Hicks, supra,* 167 U.S.App.D.C. at 182, 511 F.2d at 420.

██ The Court concludes that, in light of Alonzo Bush's past history of hostile behavior and chronic alcoholism, it was entirely foreseeable that if released without supervision and left to his own devices, Bush might become intoxicated after he left the hospital and initiate an argument with a stranger. It was foreseeable, too, that the victim of such unprovoked hostility might attempt to repel Alonzo Bush's aggressive overtures by pushing Bush away. Finally, in light of Bush's history of violence, it was entirely foreseeable that he might make a violent, even fatal attack upon another.

We further conclude that failure to notify the police so that Alonzo Bush could be placed in custody and, instead, allowing him to leave the hospital on his own, was a substantial factor in bringing about the death of Robert Williams. Sheriff Eggar testified that charges were pending against Bush. Had he been released to the sheriff Alonzo Bush would have been confined in the Meade County Jail on May 3, 1975. He would not have been wandering the streets of Rapid City, armed with a pistol.

Because we conclude that the events of May 3, 1975 were foreseeable under the circumstances and that the VA hospital's failure to notify the authorities was a substantial factor in bringing about the death of Robert Williams, we hold that the United States is liable to Mr. Williams' estate for the damages resulting from his wrongful death.

The foregoing shall constitute this Court's findings of fact and conclusions of law.