**Karole K. JENSEN, as Administratrix of the Estate of Sylvia R. Brown, Deceased, Appellant,**

v.

**Virgil L. CONRAD, in his individual and official capacity as Commissioner of the Department of Social Services; Robert Kneece, Fred G. Scott, Samuel Smith, Agnes Wilson, Oscar P. Butler, Jr., John C. Williams, Jr., and Lucy C. Trower, individually and in their official capacities as members of the State Board of the Department of Social Services; Collie L. Moore, W.H. Neal, Catherine Morris, Allen Dowdy, Arlene B. Andrews, Beatrice Sumter, Robert E. Alexander, Melissa Burnette, individually and in their official capacities as members of the Richland County Board of the Department of Social Services; Mary Williams and Patricia Jones, individually and in their official capacities as Social Workers for the South Carolina Department of Social Services; and Barbara Locklair, individually and in her official capacity as a "Home Health Nurse" for the South Carolina Department of Social Services; Appellees.**

**Karole K. JENSEN, as Administratrix of the Estate of Michael Clark, deceased; Appellant,**

v.

**Virgil L. CONRAD, in his individual and official capacity as Commissioner of the Department of Social Services; Mary D. Dusenberry, George D. Hamilton, Oscar P. Butler, Ph.D., John C. Williams, Jr., Lucy C. Thrower, Agnes Wilson, Ph.D., and W. Jerry Fedder, individually and in their official capacities as members of the State Board of the Department of Social Services; Jerry Herd, Harold E. Simpson, Ophelia S. Smith; J. Furman Gerrard, and Odell Short, individually and in their official capacities as members of the Anderson**

County Board of the Department of Social Services; Appellees,

and

Kenneth Pryor, individually and in his official capacity as Director of the Anderson County Department of Social Services; Dawn Hawkins, individually and in her official capacity as Program Director for Human Services of the Anderson County Department of Social Services; Susan Straup, individually and in her official capacity as Protective Services Supervisor of the Anderson County Department of Social Services; and Charlie Ann Jenkins, in their official capacities as social workers with the Anderson County Department of Social Services; Defendants.

Nos. 83-1801(L), 83-1936.

United States Court of Appeals, Fourth Circuit.

Argued March 5, 1984.

Decided Oct. 5, 1984.

Murnaghan, Circuit Judge, filed a concurring opinion.

O. Fayrell Furr, Jr., Columbia, S.C. (Charles L. Henshaw, Jr., Columbia, S.C., on brief), for appellant.

Joel H. Smith, Camden, S.C. (William C. Hubbard, Nelson, Mullins, Grier & Scarborough, Columbia, S.C., on brief), and James L. Werner, Columbia, S.C. (Wilburn Brewer, Jr., Nexsen, Pruet, Jacobs & Pollard, George Beighley, Richardson, Plowden, Grier & Howser; Charles E. Hill, Jr., Turner, Padgett, Graham & Laney; David Robinson, II, Robinson, McFadden, Moore, Pope, Williams, Taylor & Brailsford, Columbia, S.C., on brief), for appellees.

Before WIDENER, MURNAGHAN and ERVIN, Circuit Judges.

ERVIN, Circuit Judge:

Sylvia Brown, age seven months, and Michael Clark, age three years, died in the summer of 1979 after suffering brutal beatings at the hands of their guardians. Their estates, along with the estates of four other battered children, brought suit under 42 U.S.C. § 1983 against the Commissioner of the South Carolina Department of Social Services, members of the State Board of the Department of Social Services, members of the board of the Richland and Anderson County Departments of Social Services, and various state employed case workers. The plaintiffs alleged that the State, acting through its employees, violated the children's fourteenth amendment rights by failing to intervene and provide protection.

The Brown and Clark cases were heard by different district courts. In the Brown case the district court dismissed the suit for failure to state a claim upon which relief could be granted, 570 F.Supp. 91. The district court in the Clark case converted the defendants' motion to dismiss to summary judgment motions and ruled for the Commissioner and the board members, 570 F.Supp. 114. The Clark court, however, refused to grant summary judgment on behalf of the case workers. Under Fed. R.Civ.P. 54(b) the Clark court entered final judgment for the Commissioner and the board members and the two cases were consolidated for appeal.[1]

The issue now before us on appeal is whether the defendants' failure to provide affirmative protection to the plaintiffs' decedents creates a cognizable § 1983 claim. We conclude that at the time of the alleged violation a constitutional right of affirmative protection was not clearly established and that, therefore, good faith immunity was available to the defendants. Accordingly, we affirm the lower courts' ruling in the Brown case and affirm the grant of summary judgment in the Clark suit.

## I.

### A.

### SYLVIA BROWN

The plaintiff alleged that Sylvia Brown's plight first became known to Richland County social workers on February 28, 1979, when the then four month old child was admitted to the Richland Memorial Hospital with a fractured skull. A C.A.T. scan revealed a "healing subdural hematoma." The attending physician immediately became concerned about the possibility of physical abuse by Sylvia's parents. This suspicion, the plaintiff contends, was confirmed after Mrs. Brown and her boyfriend visited Sylvia at the hospital. Hospital social workers received a report that during the visit Mrs. Brown's boyfriend held the child by the head and neck, and slapped the child in a rough manner.

The following week, a Richland Hospital social worker reported the case to the Richland County Department of Social Services and requested a child protection investigation. After an initial review of the case, the Department of Social Services allegedly reached an agreement with Mrs. Brown requiring her to reside with Sylvia at the home of Sylvia's grandmother. Under the agreement, if Mrs. Brown returned home with her child, Sylvia would be placed in the custody of the Department of Social

1. The *Clark* court's 54(b) certification did not purport to cover the caseworkers. The district court concluded that the evidence presented was insufficient to determine the caseworkers' involvement in the Clark investigation and that therefore the plaintiffs would be given additional time to continue discovery and file a more detailed complaint. Because a final judgment order had not been entered on the question of the caseworkers' liability at the time the suits were consolidated for appeal and notice of appeal was given, we believe that it would be improper to review the *Clark* court's denial of summary judgment to the caseworkers. The appeal by the caseworkers in *Clark*, therefore, is dismissed.

All of the *Brown* court's rulings, however, as well as the *Clark* court's rulings with respect to the Commissioner and the board members, are properly before us on appeal under 28 U.S.C. § 1291.

Services. In addition to this agreement, the Department also decided that an "intensive follow-up and in-home supervision" would be required.

According to the plaintiff, over the course of the next two months the Department caseworkers failed to supervise adequately the family and carry out the recommendations of department officials and Sylvia's attending physician. The plaintiff claims that Department caseworkers visited Mrs. Brown's house only twice, and on both of those occasions Sylvia was living alone with her mother. Despite the agreement, no action was taken.

On May 11, 1979, Sylvia was brought dead on arrival to the Richland Hospital. An autopsy revealed that brain hemorrhaging had occurred three times in the previous three weeks—the last hemorrhage apparently took place only minutes before Sylvia died. After initially disclaiming responsibility,[2] Mrs. Brown pleaded guilty to involuntary manslaughter.

B.

MICHAEL CLARK

On February 28, 1980, the principal of New Prospect Elementary School informed the Anderson County Department of Social Services that the older brother of Michael Clark showed signs of child abuse. A caseworker from the Department immediately met with Michael's brother. The child was bruised about the face and told the caseworker that his father had hit him on several occasions. After conferring with teachers at the school, the caseworker concluded that a meeting with Mrs. Clark was necessary. Between March 6, 1980, and April 28, 1980, the caseworker and the Department attempted repeatedly to contact Mrs. Clark. Letters and telephone calls went unanswered, and seven visits to various addresses failed to locate the Clark family. After sixty days the Department classified the case as "unfounded" and officially closed the investigation.

On June 23, 1980, Michael Clark was beaten to death by Mrs. Clark's boyfriend, Wayne Drawdy. Drawdy was subsequently tried and convicted for the child's murder.

C.

The South Carolina Child Protection Act, S.C.Code Ann. §§ 20–7–480 *et seq.*, requires state and county board members "to [establish] an effective reporting system and . . . an effective system of service throughout the State to safeguard the well-being and development of endangered children . . . . and save them from injury and harm." S.C.Code Ann. § 20–7–480.[3] The statute charges the South Carolina State Department of Social Services with responsibility for coordinating child protection services throughout the state. Specifically, the Department is required to 1) monitor and evaluate the child protection services provided by the counties and localities; 2) establish a central registry for child abuse reports; 3) coordinate referrals of child abuse cases; and 4) conduct training programs for local agency staffs. S.C.Code Ann. § 20–7–640(C), (D); § 20–7–660(A).[4]

2. When Sylvia arrived at the hospital, Mrs. Brown insisted that she had fallen out of bed. In her complaint, however, the plaintiff pointed out that Sylvia's bed was only two feet off the floor.

3. S.C.Code Ann. § 20–7–480 states in full that:

Recognizing that abused and neglected children in South Carolina need protection, it is the purpose of this article to save them from injury and harm by establishing an effective reporting system and encouraging the reporting of children in need of protection; by establishing an effective system throughout the State to safeguard the well-being and development of endangered children and to preserve and stabilize family life, whenever appropriate; by establishing fair and equitable procedures, compatible with due process of law to intervene in family life with due regard to the safety and welfare of all family members and by establishing an effective system of protection of children from injury and harm while living in public and private residential agencies and institutions meant to serve them.

4. S.C.Code Ann. § 20–7–640(C) and (D) state in full that:

(C) State Department of Social Services responsibilities shall include, but not be limited

Under the statute the reporting system that the Department of Social Services must oversee consists of two elements: county departments and local child protection agencies. The statute mandates that the latter "be adequately staffed with persons trained in the investigation of suspected child abuse and neglect and in the provision of services to abused and neglected children and their families." S.C.Code Ann. § 20-7-650(B). The statute empowers the local agency to "petition the Family Court ... to intervene" on behalf of the child should the agency deem it necessary, but the statute does not expressly require the agency to intervene. S.C.Code Ann. § 20-7-650(J).[5]

In both the Clark and Brown cases, the plaintiffs argued before the lower court that the statute created a "special relationship" between the state and victims of suspected child abuse by imposing an affirmative duty on the state government "to save [suspected victims] from harm." Relying primarily on our decision in *Fox v. Custis,* 712 F.2d 84 (4th Cir.1983), the Clark and Brown estates contended that this "special relationship" gave rise to a right under the fourteenth amendment to affirmative protection by the State.

In the Clark case, the district court agreed with the plaintiff that where "an individual [has been] legally entrusted to the care or protection of governmental officials," a failure to protect could constitute a deprivation of life without due process and thereby violate the fourteenth amendment. J.A. at 330-33. But the court concluded that because there was no "clearly established case law" defining the "general due process" requirements of the Child Protection Act and providing "reasonable notice of possible liability," the commissioners and the board members were entitled to good faith immunity under *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Accordingly, the court granted the Commissioners' and board members' motions for summary judgment.

In the *Brown* case, the district court concluded that the plaintiff had failed to allege a federal or constitutional claim upon which relief could be granted under 42 U.S.C. § 1983. The fourteenth amendment, the court held, only created a right to affirmative protection by the state in those

to: assigning and monitoring initial child protection responsibility through periodic review of services offered throughout the State; assisting in the diagnosis of child abuse and neglect; coordinating referrals of known or suspected child abuse and neglect; measuring the effectiveness of existing child protection programs and facilitating research, planning and program development; and establishing and monitoring a statewide central registry for child abuse and neglect as hereinafter provided.

(D) The County Department of Social Services in each county is designated as the Child Protective Service Agency, whose duties are set forth in § 20-7-650. The county in which the child resides shall be the legal place of venue; provided, that in conjunction with the powers enumerated in this section, each County Board of Social Services shall appoint an advisory board to be composed of resident professionals in the county in which the child resides in the fields of medicine, including nurses, education, health, social workers, members of the clergy and law enforcement officials, if available for the purpose of determining the course of protective action to be taken by the County Department of Social Services. These recommendations are to be deemed advisory only. These appointments to the advisory board shall be made in a nondiscriminatory manner.

S.C.Code Ann. § 20-7-660(A) states in full that:

(A) The Department of Social Services Protective Services and the local child protective services agencies shall, on a continuing basis, inform all persons required to report under this article of the nature, problem and extent of child abuse and neglect and of their duties and responsibilities in accordance with this article. The Department of Social Services and local agencies shall also, on a continuing basis, conduct training programs for local agency staffs as well as appropriate training for persons required to report under this article.

5. S.C.Code Ann. § 20-7-650(J) states in full that:

(J) If at any time after the initiation of protective services by the agency those receiving services indicate a refusal to cooperate, the agency shall withdraw. If the facts so warrant, the agency may petition the Family Court to invoke the jurisdiction of the court under the Family Court Act to intervene, but in no case shall the agency threaten such action to coerce participation.

instances where legal custody or direct supervisory control of the victim lay in the hands of the state. Because the appellant's complaint never alleged that the state had assumed custody or direct supervisory control of Sylvia Brown under the Act, the court dismissed the suit as to all defendants.

On appeal, the appellants argue that the courts below erred in both granting summary judgment for the Commissioner and the county and board members in *Brown* and in dismissing the suit in *Clark*. The appellants' contentions, we believe, hinge on two "threshold" issues: whether the fourteenth amendment affords the appellants a right to affirmative protection by the state, and if such a right presently exists, whether it was established clearly enough at the time the alleged deprivation occurred to avert the application of good faith immunity under *Harlow*.

## II.

### A.

Section 1983 of the Civil Rights Act only protects against action under color of state law that "subjects ... any citizen ... or other person ... to the deprivation of any rights ... secured by the Constitution and laws" of the United States. *Baker v. McCollan*, 443 U.S. 137, 146–47, 99 S.Ct. 2689, 2695–96, 61 L.Ed.2d 433 (1979); *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976); *Fox v. Custis*, 712 F.2d 84, 87 (4th Cir.1983). Thus, "the first inquiry in any § 1983 suit ... is whether the plaintiff has been deprived of [such] a right." *Baker*, 443 U.S. at 140, 99 S.Ct. at 2692. This inquiry, in turn, "involves 'isolating the particular constitutional infringement complained of'." *Fox*, 712 F.2d at 87, *quoting Martinez v. California*, 444 U.S. 277, 284 n. 9, 100 S.Ct. 553, 558 n. 9, 62 L.Ed.2d 481 (1980).[6]

In this case the appellants argue that the decedents possessed a constitutional right to protection by the government from harm inflicted by their parents or those acting as their parents. Specifically, the appellants assert that the State's failure to intervene effectively deprived Michael Clark and Sylvia Brown of liberty rights secured by the fourteenth amendment. As an initial matter, therefore, our inquiry must focus on the extent to which we can now assert that a right of affirmative protection exists. But our analysis must not stop there; we must also determine the precise time at which such a right—if it presently exists—can be said to have emerged. *See Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). For this a careful review of recent case law is required.

The most relevant line of cases dates from 1976. The alleged violations occurred in 1979. Thus our examination of the case law must be aimed at determining the extent to which a clearly defined right had emerged from this shifting line of cases as of 1979.

#### i.

The current debate over affirmative duty and constitutional tort stems in large part from a prisoner petition case decided by the Supreme Court in 1976. In *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), an inmate of the Texas Department of Corrections sued prison officials for failing to provide adequate medical treatment for a back injury suffered while performing a prison work assignment. The prisoner's claim was brought under § 1983, and alleged that prison officials had subjected him to cruel and unusual punishment in violation of the eighth amendment. The Court held that although the record failed to support the prisoner's claims, prison officials could not act with "deliberate indifference" to the medical needs of prisoners without violating the eighth amendment:

> We therefore conclude that deliberate indifference to serious medical needs of

6. Federal jurisdiction in this case arises under 42 U.S.C. § 1983. Our inquiry, therefore, is limited solely to determining whether the plaintiffs have alleged a vindicable federal or constitutional right. A state cause of action, based either on statute or on common law, may be available to the plaintiffs, see part III infra, but that is not the issue before us.

prisoners constitutes the "unnecessary and wanton infliction of pain," *Gregg v. Georgia*, supra, [428 U.S. 153] at 182–183, 49 L.Ed.2d 859, 96 S.Ct. 2909 [2925] (joint opinion), proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983.

429 U.S. at 104–05, 97 S.Ct. at 291. The Court reasoned that because the prisoner was unable " 'by reason of the deprivation of his liberty, to care for himself' ", it was only "just" that " 'the public' " be required to care for him. *Id.* at 103–04, 97 S.Ct. at 290–91, *quoting Spicer v. Williamson*, 191 N.C. 487, 490, 132 S.E. 291, 293 (1926). In the Court's view, therefore, the government had an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle*, 429 U.S. at 103, 97 S.Ct. at 290.

We followed *Estelle* in several similar eighth amendment § 1983 prisoner cases. *See Orpiano v. Johnson*, 632 F.2d 1096 (4th Cir.1980); *Davis v. Zahradnick*, 600 F.2d 458 (4th Cir.1979); *Withers v. Levine*, 615 F.2d 158 (4th Cir.), *cert. denied*, 449 U.S. 849, 101 S.Ct. 136, 66 L.Ed.2d 59 (1980). In all of these cases, we limited the imposition of an affirmative duty of care on the government to prison settings where eighth amendment concerns were involved and state employees had acted with "deliberate indifference."

Thus, as of 1980, affirmative duty and constitutional rights had found a common ground in this circuit only in the prison setting. The government's duty to protect applied only to those *incarcerated* by the state, for only those individuals could be subjected to an eighth amendment violation. A look at the cases that quickly followed *Estelle*—cases which expanded the right to affirmative protection—underscores by comparison just how narrow the right was in 1980. It is to those cases that we now turn.

ii.

The first major post-*Estelle* decision was decided by the Supreme Court in 1980. In *Martinez v. California*, 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980), the Court was asked to address the question of whether the government had an affirmative duty under the fourteenth amendment to protect a private citizen from the actions of a parolee. Martinez, a fifteen year old girl, had been murdered by a "mentally disturbed sex offender" who had been sentenced to one to twenty years, but paroled after five. The State of California conceded that the parolee was a known risk when he was let out. Legally, the attacker was still in the custody of the state when he killed Martinez.

The Court ruled that Martinez had failed to allege a cognizable claim under § 1983. Yet rather than addressing directly the issue of whether Martinez had a constitutional right to protection under the fourteenth amendment, the Court chose to decide the case on the narrow grounds that Martinez had failed to establish proximate cause. The parolee, the Court pointed out, was not "an agent of the parole board," *id.* at 285, 100 S.Ct. at 559, and the murder had occurred five months after the parolee's release. *Id.* Under these circumstances, the Court concluded, the causal connection between the action of the parolee and that of the State was too attenuated to hold the government liable.[7]

But in the final paragraph, the Court clearly left open the possibility that in another setting the fourteenth amendment right asserted by Martinez might be upheld in a § 1983 suit:

7. *Cf. Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976) (police department's failure to act in face of statistical pattern of police abuse does not give rise to fourteenth amendment violation because no showing of "direct responsibility" by the department for the incidents).

> We need not and do not decide that a parole officer could never be deemed to "deprive" someone of life by action taken in connection with the release of a prisoner on parole. But we hold that at least under the particular circumstances of this parole decision, appellants' decedent's death is too remote a consequence of the parole officers' action to hold them responsible under the federal civil rights law.

*Id.* at 285, 100 S.Ct. at 559.

In 1981 the Second Circuit attempted to resolve the question left open by *Martinez.* In *Doe v. New York City Department of Social Services,* 649 F.2d 134 (2d Cir.1981) two young girls filed suit against the State of New York after they were beaten and sexually abused by their foster father. The girls, who were technically in the custody of the New York City Commissioner of Welfare, alleged that the State had violated an affirmative duty of protection—guaranteed under the fourteenth amendment—when it failed to inspect and recertify the foster home to which the claimants had been assigned.

Without expressly mentioning the fourteenth amendment, the court held that the State could violate a "constitutionally protected *liberty* or property interest" by failing to protect an individual who had been placed in the government's "custody or care." *Id.* at 141.[8] In its discussion the court cited *Estelle v. Gamble* and other eighth amendment prisoner cases. *Id.* This citation was significant, for it marked the first time that the eighth amendment analysis had been applied to a traditional fourteenth amendment claim involving liberty and property interests.

One year later, in 1982, the Seventh Circuit also addressed the issue left open in *Martinez.* Although the court ultimately ruled against the plaintiff,[9] it significantly expanded the reasoning in *Doe.* In *Bowers v. DeVito,* 686 F.2d 616 (7th Cir.1982), a schizophrenic, with a history of criminal violence murdered Marguerite Bowers one year after being released from an Indiana State Mental Hospital. Bowers' estate filed a § 1983 suit against the hospital, claiming that the State had reason to know that the former patient was dangerous and thus had acted recklessly in permitting his discharge.

The court disagreed. Expressly refusing to distinguish the case from *Martinez,* the court ruled that "there is no constitutional right to be protected by the State against being murdered by criminals or madmen." In the Seventh Circuit's view, the Constitution was designed as "a charter of negative liberties; it tells the state to let people alone; it does not require the federal government or the state to provide services, even so elementary a service as maintaining law and order." *Id.* at 618.

The court, however, was careful to limit its holding to situations where the state had not taken an active role in placing an individual in a position of danger:

> We do not want to pretend that the line between action and inaction, between inflicting and failing to prevent the infliction of harm, is clearer than it is. If the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit.

*Id.* It was here, the court reasoned, that a fourteenth amendment claim based on an affirmative duty overlapped with the affirmative duty recognized by the Supreme Court in eighth amendment prisoner cases:

> It is on this theory that state prison personnel are sometimes held liable un-

8. After finding that the district court had committed numerous errors in conducting pretrial discovery, in admitting and excluding evidence, and in instructing the jury, the Second Circuit reversed and remanded *Doe* for a new trial. On remand, the district court judge set aside a favorable jury verdict for the plaintiff by granting defendants' request for J.N.O.V. The Second Circuit, however, reversed the district court's grant of J.N.O.V. and reinstated the jury verdict after determining that there was sufficient evidence to support a jury verdict for the plaintiff. *Doe v. New York City Department of Social Services,* 709 F.2d 782, 790–92 (2d Cir.), *cert. denied,* 104 S.Ct. 195 (1983).

9. See *infra* note 10.

der section 1983 for the violence of one prison inmate against another.

*Id.* Significantly, the court did not draw a distinction between "custodial" and "other" relationships. In this sense, *Bowers* moved one step beyond *Doe.* Rather than implicitly limiting governmental liberty to custodial relationships the *Bowers* court chose to speak in broader terms; in the court's view, it was not the precise type of relationship that mattered, but whether the government had placed an individual in danger.[10]

The analytical approach of *Bowers* was closely followed by this court one year later in *Fox v. Custis,* 712 F.2d 86 (4th Cir. 1983). The facts of *Fox* were similar to *Martinez.* Fox, a young woman, suffered injuries when a Virginia parolee set fire to her house. The parolee had been convicted previously of arson and grand larceny and sentenced to twenty years. After two years, he was paroled. Despite several violations, the parolee was permitted to remain on parole. It was at this point that the *Fox* arson occurred.

We approached the question of affirmative duty in two ways. First, as in *Martinez,* we concluded that the injuries were " 'too remote' from the challenged conduct of the State to constitute a 'deprivation' of constitutional rights under § 1983." *Id.* at 87. But convinced that the "mix of factors" made this a less persuasive case than *Martinez* to decide on proximate cause grounds, we concluded that it was also necessary to examine whether the appellant had asserted a cognizable constitutional claim under the fourteenth amendment. Citing *Bowers,* we held that a duty could arise out of special "custodial or other relationships":

> With one qualification, we agree with the Seventh Circuit's recent holding that, in general, there simply is "no constitutional right to be protected by the state against ... criminals or madmen," and that because in corollary, there is no "constitutional duty [on the state] to provide such protection, its failure to do so is not actionable under section 1983." *Bowers v. DeVito,* 686 F.2d 616, 618 (7th Cir.1982). The qualification—an important one actually acknowledged by the Bowers court, id.—is that such a right and corollary duty may arise out of special custodial or other relationships created or assumed by the state in respect of particular persons. For example—as we have held in this circuit—such a right/duty relationship may arise under § 1983 with respect to inmates in the state's prisons or patients in its mental institutions whom the state knows to be under specific risk of harm from themselves or others in the state's custody or subject to its effective control. *Withers v. Levine,* 615 F.2d 158 (4th Cir.), cert. denied, 449 U.S. 849, 101 S.Ct. 136, 66 L.Ed.2d 59 (1980) (prison inmates under known risk of harm from homosexual assaults by other inmates); *Davis v. Zahradnick,* 600 F.2d 458 (4th Cir.1979) (inmate under observed attack by another inmate); *Woodhous v. Virginia,* 487 F.2d 889 (4th Cir.1973) (same as Withers); cf. *Orpiano v. Johnson,* 632 F.2d 1096, 1101–03 (4th Cir.1980), cert. denied, 450 U.S. 929, 101 S.Ct. 1387, 67 L.Ed.2d 361 (1981) (no right where no pervasive risk of harm and specific risk unknown); see also *Spence v. Staras,* 507 F.2d 554 (7th Cir.1974); *Gann v. Delaware State Hospital,* 543 F.Supp. 268, 272 (D.Del. 1982); *Walker v. Rowe,* 535 F.Supp. 55 (N.D.Ill.1982) (duty of state to protect guards).

*Id.* at 88.

Our ruling, however, did not simply rehash *Bowers.* In two important respects *Fox* expanded on precedent. First, *Fox* completed the convergence of eighth and fourteenth amendment analysis that had begun in *Doe* and took shape in *Bowers.* The constitutional right that we asserted could arise was clearly based on the fourteenth amendment, but the shape and definition that we gave to that right by using the term "custodial or other relationship" was influenced in large part by the consid-

10. Ultimately the court ruled against Bowers because she had failed to show that the state had placed her in a position of danger. 686 F.2d at 618–19.

erations that lay behind the eighth amendment cases. Recognizing that the fourteenth amendment could not be read to establish a general affirmative duty to the public at large, we chose to limit that duty by applying a rationale similar to that used in *Estelle:* namely, that where the state had selected an individual from the public at large and placed him in a position of danger, the state was enough of an "active tortfeasor" to make it only "just" that the state be charged with an affirmative duty of protection. *Bowers* and *Doe* also made use of the eighth amendment analysis to address the fourteenth amendment issue, but *Fox* acknowledged more candidly and expressly than either *Doe* or *Bowers* the concerns that had helped to shape the contours of the duty imposed on the government.

Second, the *Fox* ruling was important because it stated in terms more explicit than *Bowers* that a right to affirmative protection need not be limited by a determination that there was a "custodial relationship." The *Fox* court ruled that a right to protection could arise from a custodial *or other relationship.*

Fox's estate, however, failed to claim that a special relationship existed between her and the State. For this reason we found it unnecessary to define the type of "special relationship required to give rise to a right ... to affirmative protection...." 712 F.2d at 88. In one sense, then, *Fox* represented the culmination of a line of analysis that had begun in *Martinez,* for it firmly established that a right of affirmative protection could arise under the fourteenth amendment. But at the same time *Fox* left the inquiry nearly as open-ended as *Martinez,* for it did not purport to delimit the scope of the right.

Having established that a right of protection may, given the proper facts, exist at present, the question now becomes whether that right was properly invoked by the plaintiffs in the cases at hand.

B.

Under *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), governmental officials will not be held liable if the law at the time of the alleged wrongdoing was not "clearly established." *Id.* at 818, 102 S.Ct. at 2738. Sylvia Brown and Michael Clark died in the spring of 1979. As our discussion in part II A above makes clear, an affirmative duty of protection under the fourteenth amendment did not emerge until after 1980. Indeed, the comparison of the post-1980 *Martinez-Fox* line of cases with *Estelle* and its pre-1980 eighth amendment progeny demonstrates just how limited the right to affirmative protection was in this circuit at the time the alleged violations occurred. Although the seeds of a fourteenth amendment-based right lay dormant in the eighth amendment cases, the defendants could not have anticipated the expansion that would later occur.

Moreover, even were we to rule that the defendants could have foreseen the *Fox* holding, it is not clear that under the facts of this case the defendants could, or should, have foreseen that a "special relationship" existed. Given the absence of specific guidelines to determine precisely what constitutes a "special relationship" and the particularly "close" nature of the factual cases before us, we would be hard-pressed to conclude that the law as it affected the defendants was "clearly established." [11] We conclude, therefore, that we

11. Although we find no need to provide a comprehensive definition of "special relationship" given the facts of these cases, we note that these cases underscore some of the factors that should be included in a "special relationship" analysis. These factors—which would make these cases particularly close ones were we to decide them—include:

1) Whether the victim or the perpetrator was in legal custody at the time of the incident, or had been in legal custody prior to the incident.

Here, for example, as in *Fox* and *Martinez* and unlike the situations in *Withers* and *Woodhous,* the claimants were members of the general public and not in custody. The state defendants were unaware that they, as opposed to anyone else in the public at large, faced a special danger. This fact, combined with the lack of a past or present custodial

need not decide whether, under the circumstances of this case, the State had created or assumed a "special relationship" with the Clark and Brown families. All of the defendants were entitled to a good faith immunity defense against liability under § 1983.[12] The district court should have dismissed both complaints along with the pendent claims at the summary judgment stage.[13]

We emphasize, however, that our decision today does not mean that a good faith immunity defense will always be available for defendants sued for failing to provide affirmative protection based on a *Fox* analysis. We hold only that under the facts of this case neither the state and county board members nor the caseworkers could reasonably have been expected to know that a failure to protect Sylvia Brown and Michael Clark potentially constituted a violation of their fourteenth amendment rights. Because our decision is based upon our belief that the *Fox* decision could not have been anticipated by the defendants, we need not attempt a definition of the type of relationship required to give rise to a right of protection under *Fox*. Were the issue properly before this court on different facts, there would be nothing to preclude further definition of the meaning of that term followed by a ruling that the facts of that case fell within the meaning of "special relationship."

relationship between the state and the perpetrators, would argue against finding that a special relationship existed.

2) Whether the state has expressly stated its desire to provide affirmative protection to a particular class or specific individuals.

This factor does not really argue convincingly one way or the other in our cases. It is difficult to conclude that the State intended to "single out" the decedents and place them in its own care as in the eighth amendment cases that *Fox* relies on so heavily. On the other hand, the preamble of the Child Protection Act does clearly express a desire to take affirmative steps to locate and protect potentially abused children.

3) Whether the State knew of the claimants' plight.

This factor goes more to the breach of the "special relationship" than a definition of the relationship. Yet it may prove probative of the extent to which the State intended to protect or watch over the particular claimant involved. In this case there is some indication that the State knew the children were being beaten. This strengthens the argument that some sort of special relationship had been established.

**12.** The appellants argue that good faith immunity is not applicable because the affirmative duty owed by the State was "clearly established" in the Child Protection Act at the time the alleged wrongdoing occurred. This argument simply misses the mark. The law in this instance that must be "clearly established" to avert the application of *Harlow* is a constitutional right to protection by the State. A state statute, by itself, cannot create a substantive constitutional right. *Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980). Once an affirmative duty has been found to exist under the fourteenth amendment, it may then be possible for a State statute to trigger the application of that right. But if the underlying substantive right has not yet been clearly established, good faith immunity may be invoked regardless of the language of the statute.

Moreover, it is not even clear that the Child Protection Act requires the type of affirmative protection that the claimants argue that it does. The Act does not create an express duty of intervention but rather provides only that the State "may" intervene. *See* discussion supra at 189.

**13.** Judge Wilkins did not act improperly in dismissing the case at the summary judgment stage with respect to those defendants for whom he found qualified immunity was applicable. In *Harlow* the Supreme Court eliminated the subjective good faith standard that had been used to determine if qualified immunity should be applied to executive officials and substituted an "objective reasonableness" test. The Court reasoned that if the law was not clearly established, immunity should be applied at the pretrial stage so as to minimize disruption of government activities. The court stated that:

> Reliance on the objective reasonableness of an official's conduct, as measured by reference to clearly established law, should avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment. On summary judgment, the judge may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred. If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to "know" that the law forbade conduct not previously identified as unlawful. Until this threshold immunity question is resolved, discovery should not be allowed.

457 U.S. at 818, 102 S.Ct. at 2738.

## III.

Although our decision today leaves the appellants without a remedy in federal court, the victim's estates still have several causes of action available to them in state court. We express no view on the appellants' rights under the tort law of South Carolina, but as the Seventh Circuit pointed out in *Bowers*, "[t]he tendency in the common law has been to impose ever greater liability on officials who negligently fail to protect the public from dangerous criminals and lunatics." *Bowers*, 666 F.2d at 618.[14]

## IV.

For the foregoing reasons, the judgment of the District Court for the District of South Carolina at Columbia is affirmed, and the judgment of the District Court for the District of South Carolina at Greenville is affirmed in part and dismissed in part.

AFFIRMED IN PART; DISMISSED IN PART.

MURNAGHAN, Circuit Judge, concurring:

Sometimes I yield to an impulse to embellish an opinion in a way not strictly necessary. The notion may exist that I can clarify or improve the law, even though the issue I endeavor to address is not truly presented by the case. As time goes by, however, I am coming more and more to an appreciation that, however silver the speech, silence is usually constructed from 24 karat gold.

So, with deference, and despite the freshly minted pure silver from which the majority opinion has been cast, I disassociate myself from everything appearing in the opinion endeavoring to establish the existence of a special relationship between the brutalized children on the one hand and the South Carolina Department of Social Services and its case workers on the other. Were the question before us, we should have to investigate whether the "special relationship" due process contention could hold water in the absence of the South Carolina legislation. Parental control of the destiny of a child may, in general, constitute so important a right that the Supreme Court might determine that a constitutional duty simply is not imposed on any state or local government employee who learns of suspected abuse to take steps to insure that a child apparently brutalized is removed from parental custody or otherwise guarded against violence from the parents.

Second, assuming that, absent statute, no right exists under the Fourteenth Amendment, we should, nevertheless, have further to decide whether the South Carolina statute brings about a *constitutional* right of affirmative protection. Neither of those two questions is easy of resolution. The cases supporting the majority's conclusion that there is a right (though admittedly rendered inapplicable here because of the existence of a good faith immunity defense) generally partake of the characteristic called "dicta". They are ones which assume there is a right, but find it not applicable or not violated on the facts of the cases themselves.

Accordingly, prudence dictates to me that I limit my participation in the majority opinion to concurrence in the proposition which all panel members accept: namely, that, *whether or not a constitutional right to affirmative protection exists*, it manifestly was not established clearly enough to permit recovery at the time that the alleged deprivations occurred. My concurrence consequently rests solely on the uncontrovertible existence in each of the cases of good faith immunity as a defense against liability under 42 U.S.C. § 1983.

---

**14.** *See* e.g., *Homere v. State*, 48 App.Div.2d 422, 370 N.Y.S.2d 246 (1975); *Leverett v. State*, 61 Ohio App.2d 35, 40–41, 399 N.E.2d 106, 109–10 (1978); *Williams v. United States*, 450 F.Supp. 1040, 1044–45 (D.S.D.1978).