865 F.2d 1257
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Stephen A. DAHN, individually and as guardian of his two
minor daughters, April and Julie, and as administrator of
the estate of his wife, Mary Elizabeth Dahn; April S. Dahn;
Julie L. Dahn, who sue by their father and next friend,
Stephen A. Dahn, Plaintiffs-Appellants,
v.
The DISTRICT OF COLUMBIA; District of Columbia Department
of Corrections; Marion S. Barry, Jr., Mayor of D.C.;
Hallem H. Williams, Jr., Director of D.C. Department of
Corrections; Anthony R. Patterson, Administrator; District
of Columbia Community Correctional Center; Harry Walsh;
John Doe; John Doe, Defendants-Appellees.
 No. 88-3837.
 United States Court of Appeals, Fourth Circuit.
 Argued: Nov. 3, 1988.
Decided: Dec. 20, 1988.
 
 Jonathan R. Mook (Bernard J. DiMuro, Hirschkop, Dimuro, & Mook, P.C.; Robert J. Zelnick, Szabo, McCarthy, Quinto, Webb & Zelnick, on brief), for appellants.
 Donna M. Murasky, Assistant Corporation Counsel (Frederick D. Cooke, Jr., Corporation Counsel, Charles L. Reischel, Deputy Corporation Counsel, Appellate Division; Beverly A. Lewis, Department of Corrections, Correctional Litigation Section; Cleveland Thornton, Rubenstein & Thornton, on brief), for appellees.
 Before HARRISON L. WINTER, Chief Judge, and SPROUSE and CHAPMAN, Circuit Judges.
 SPROUSE, Circuit Judge:
 
 
 1
 Stephen Dahn brought this action individually, as guardian for his two minor daughters, and as administrator of his wife's estate. He sued the District of Columbia and several individuals in their official capacities alleging causes of action under 42 U.S.C. Sec. 1983 and state law. His complaint alleged that the defendants were responsible for the murder of his wife, Mary Elizabeth Dahn, because they took inadequate action to apprehend an escapee from a halfway house who, after escaping, committed the murder.
 
 
 2
 The district court treated the District of Columbia's rule 12(b) dismissal motion as a motion for summary judgment under rule 56 and granted it, holding that Dahn's allegations amounted to no more than negligence and that no view of the facts would establish a special relationship between Mrs. Dahn and the District of Columbia such as might impose a constitutional duty owed specifically to her. In addition, the district court held that the District of Columbia was not a citizen for diversity of citizenship jurisdiction purposes and dismissed the state law claims. Finally, concluding that the individual defendants had been sued only in their representative capacities, it dismissed them as well. Dahn appeals. Agreeing with the district court, we affirm.
 
 
 3
 In September 1983, Tony Mackall was sentenced in the District of Columbia to eight years in prison on charges of burglary and unauthorized use of a vehicle. While in prison, he was disciplined for possession of a knife, assault, and threatening prison guards. On one occasion, Mackall's parole officer stated that, if released in June 1985, he would be "a serious potential threat to the community." Nevertheless, Mackall was released into a halfway house program in October 1986. This program allowed him to work in the community, but he had to return to the house at specified times.
 
 
 4
 On November 26, 1986, Mackall did not return to the house. Two days later, on November 28, an escape report was prepared and given to the Warrant Squad of the D.C. Department of Corrections, which was responsible for preparing the affidavit necessary to obtain a prison breach warrant. This report was not logged into the Warrant Squad until Monday, December 1, and was not assigned to an officer until Tuesday, December 2. Officer Lawrence prepared the warrant and submitted it to the typist on December 3, but it was not typed, and the warrant not obtained, until December 8. After Mackall escaped, therefore, twelve days elapsed before the District began to look for him. On December 11, two officers from the Warrant Squad, using information contained in the escape report, called Mackall's sister, his mother, and a friend. Within twenty-four hours, they had apprehended him.
 
 
 5
 In the meantime, on December 9, Mackall appeared at the Lorton Reformatory, where he had once been a prisoner, and spoke with some guards and a parole officer. Apparently no one at Lorton had been notified of his escape. Four hours later, Mackall robbed a gas station in Woodbridge, Virginia, and held Mrs. Dahn, who was manning the cash register, at gunpoint. After taking money from her, he shot and killed her in the presence of her husband and children.
 
 
 6
 Although there was no evidentiary submission to support the representation, Dahn's counsel stated that Mrs. Massey, Mackall's employer, would have testified that Mackall told the Masseys that the gas station where the Dahns worked would be an "easy mark" and that she would have repeated that remark to any officer investigating the escape if she had been asked.
 
 
 7
 The District of Columbia has admitted a multitude of errors in their handling of this escape and has disciplined several of its employees. An Escape Review Committee found that the administrators of the halfway house had not provided proper procedures for handling escapes. James Slade, the Chief of the Warrant Squad, admitted that the affidavit should have been typed on December 3 and stated that new procedures had been implemented to prevent similar "blunder[s]." In addition, he told the Escape Review Committee, "Getting prison breach warrants for halfway house escapees is a low priority." Thus, although the District's operational manual required that all affidavits be typed within twenty-four hours after the escape report is received, Slade testified that this policy was not regularly followed for halfway house escapees. Slade's testimony is supported by Officer Lawrence, who said that he was told that the "unusual" delay was not unusual at all because prison warrant affidavits were not a priority. He also stated he had taken no actions to locate Mackall while waiting for the affidavit to be typed.
 
 
 8
 Dahn, on appeal, contends, among other things, that the district court erred in finding that Dahn had failed to show a special relationship between his wife and the defendants which would support a claim under Sec. 1983 and therefore granting summary judgment in favor of the District of Columbia. He primarily bases this on his contention that had corrections officers reacted properly to Mackall's failure to return to the halfway house, they would have been aware of the specific danger to Mrs. Dahn.
 
 
 9
 In Martinez v. California, 444 U.S. 277 (1980), the Supreme Court held that the state action involved had not deprived the victim of her rights secured by the United States Constitution. The victim, a fifteen-year-old girl, had been tortured and murdered by a prisoner whom the parole board had paroled knowing he was dangerous and knowing of a likelihood he would commit another violent crime. The Court noted that the fourteenth amendment protects citizens "only from deprivation by the 'State ... of life ... without due process of law.' " Id. at 284. The Court held that the murder, five months after the parole decision, "cannot be fairly characterized as state action." Id. at 285.
 
 
 10
 Three factors convinced the Court that the paroled prisoner's actions could not be fairly ascribed to the parole board. First, five months had elapsed since the parole decision. Second, he was not an agent of the board. Third, "the parole board was not aware that [the victim], as distinguished from the public at large, faced any special danger." Given these factors, the Court stated:
 
 
 11
 We need not and do not decide that a parole officer could never be deemed to "deprive" someone of life by action taken in connection with the release of a prisoner on parole. But we do hold that at least under the particular circumstances of this decision, [the victim's] death is too remote a consequence of the parole officers' action to hold them responsible under the federal civil rights law.
 
 
 12
 Id. (footnote omitted).
 
 
 13
 We first recognized an affirmative constitutional duty on the part of the government to protect certain individuals in the context of prisoner suits. Withers v. Levine, 615 F.2d 158 (4th Cir.), cert. denied, 449 U.S. 849 (1980), and Woodhous v. Virginia, 487 F.2d 889 (4th Cir.1973) (prison inmates under known risk of harm from homosexual assaults by other inmates); Davis v. Zahradnick, 600 F.2d 458 (4th Cir.1979) (inmate observed under attack by another inmate). In Fox v. Custis, 712 F.2d 84 (4th Cir.1983), we expanded the possible area where constitutional duty of protection to particular individuals might arise. The plaintiffs in Fox had been raped, beaten, stabbed, and set afire by a paroled prisoner who had been allowed to remain on parole despite being convicted of defrauding an innkeeper, being under suspicion in an arson murder, and having a known propensity for arson, sexual aberrations, and other criminal behavior. We considered whether those gross violations of the plaintiffs' rights entitled them to civil damages against their attacker's parole officers. Finding that the causal relationship was considerably less attenuated than in Martinez but still too remote, we held that the plaintiffs had not been deprived by the defendants of a right protected by the Constitution because there was no evidence of "a special relationship required to give rise to a right, vindicable under Sec. 1983, to affirmative protection by the state." Id. at 88. In reaching that conclusion, we stated:
 
 
 14
 With one qualification, ... there simply is "no constitutional right to be protected by the state against ... criminals or madmen," and ... because, in corollary, there is no "constitutional duty [on the state] to provide such protection, its failure to do so is not actionable under section 1983." Bowers v. DeVito, 686 F.2d 616, 618 (7th Cir.1982). The qualification ... is that such a right and corollary duty may arise out of special custodial or other relationships created or assumed by the state in respect of particular persons.
 
 
 15
 Id. Significantly, the Seventh Circuit in Bowers and this court in Fox did not limit the qualification to prison custody circumstances.
 
 
 16
 In Jensen v. Conrad, 747 F.2d 185 (4th Cir.1984) cert. denied, 470 U.S. 1052 (1985), we again discussed the nature of the affirmative duty to protect. The defendants in that case were local and state child protection agencies who had failed to intervene and prevent the deaths of several children at the hand of their guardians. Although we held that the duty had not been expanded outside of the prison context at the time the deaths occurred and the defendants were, therefore, entitled to good faith immunity, we examined the case law and reemphasized that the duty was no longer limited to custodial relationships. Analyzing Fox, we stated:
 
 
 17
 Recognizing that the fourteenth amendment could not be read to establish a general affirmative duty to the public at large, we chose to limit that duty by applying a rationale similar to that used in Estelle [v. Gamble, 429 U.S. 97 (1976) ]: namely, that where the state had selected an individual from the public at large and placed him in a position of danger, the state was enough of an "active tortfeasor" to make it only "just" that the state be charged with an affirmative duty of protection.
 
 
 18
 Id. at 194.
 
 
 19
 Relying on such cases as Withers and Nishiyama v. Dickson County, 814 F.2d 277 (6th Cir.1987) (en banc), Dahn urges that the District of Columbia had a special duty to his wife under the rationale of those cases. Applying the Martinez and Fox rationale but claiming the facts of those cases are distinguishable, Dahn argues that the causal relationship is not remote at all, the murder occurring twelve days after Mackall's escape and while the grossly negligent acts of the defendants were continuing. He argues that, if the District of Columbia officials had taken the steps they eventually took when they ought to have taken them, Mackall would have been captured before killing Mrs. Dahn.
 
 
 20
 We agree that a strong possibility exists that but for the inexcusable misfeasance of the employees of the District of Columbia this tragic crime would not have been committed. The liability of the District of Columbia vel non, however, is not determined by that analysis. The basic question is whether the reaction of the District of Columbia corrections officials to Mackall's escape under these circumstances represents the type of state action contemplated by the fourteenth amendment. Like the Supreme Court in Martinez and like our brethren in Fox and Jensen, we recognize that there conceivably may be actions by parole officers, corrections officers, and others who restrain dangerous criminals which, under some circumstances, might rise to the level of fourteenth amendment "state action" toward a citizen injured by a released or improperly supervised criminal. We cannot, however, conclude that the actions of the corrections officers here are of that type. Without question, a public entity with law enforcement and related responsibilities has a public and political duty to protect its citizens from the dangerous acts of criminals. As we said in Fox, however, generally no constitutional right exists to be protected by the state against criminals or madmen and, therefore, there is no right of action under Sec. 1983 for the failure to provide such protection--unless, of course, the state has a special custodial or other relationship with the victim which it has created or has assumed and which distinguishes the victim from the general populace.
 
 
 21
 Although Mrs. Dahn had the same right to be protected from this mad criminal's heinous act as every citizen of the area where Mackall was incarcerated, she was in the same position as the plaintiffs in Fox. We said there:
 
 
 22
 The claimants here were simply members of the general public, living in the free society, and having no special custodial or other relationship with the state. As in Martinez, ... the state agent defendants here were "unaware that the [claimants] as distinguished from the public at large faced any special danger."
 
 
 23
 712 F.2d at 88 (quoting Martinez, 444 U.S. at 285).
 
 
 24
 The murder of this lady in the presence of her family cannot but fill every citizen with revulsion, and we cannot condemn the involved corrections personnel too strongly for their dereliction that contributed to this tragic crime. Yet, for the purposes of this civil Sec. 1983 action, we must conclude that she was a member of the general public having no special relationship with the District of Columbia upon which she could base a Sec. 1983 action against it for its employees' failure to protect her.
 
 
 25
 Dahn contends that, even if his Sec. 1983 claims were correctly dismissed, the district court retained jurisdiction over the District of Columbia on the remaining state-law claims either under diversity of citizenship jurisdiction or as a pendent party. We disagree. Diversity of citizenship jurisdiction is governed by 28 U.S.C. Sec. 1332(a) which provides that "[t]he district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $10,000 ... and is between ... citizens of different States." 28 U.S.C. Sec. 1332(d) further provides that "[t]he word 'States,' as used in this section, includes ... the District of Columbia."
 
 
 26
 The United States Supreme Court, of course, has concluded that a state cannot be a party to a diversity action. Cary v. White, 457 U.S. 85, 87-88 (1982); Postal Telegraph Cable Co. v. Alabama, 155 U.S. 482, 487 (1894). In Long v. District of Columbia, 820 F.2d 409 (D.C.Cir.1987), the District of Columbia Circuit, in a well-written opinion, applied the same rationale to the District of Columbia--concluding that for diversity purposes the District of Columbia could not be a citizen of itself. We agree that defining the District of Columbia as a state for one purpose in Sec. 1332 and considering it as a citizen of itself for another purpose would be anomalous.
 
 
 27
 Finally, we also agree with the statement in Long "that Congress, in enacting the diversity statute, impliedly rejected the use of ... pendent party jurisdiction in a suit based on diversity to hear a claim against a party whom the plaintiff could not initially have sued in diversity." Long, 820 F.2d at 416.
 
 
 28
 In view of the above, the judgment of the district court is affirmed.
 
 
 29
 AFFIRMNED.