**DOROTHY J., individually and on behalf of Brian B., Plaintiff,**

v.

**LITTLE ROCK SCHOOL DISTRICT; Centers for Youth and Families, Bruce Limozaine, individually and in his official capacity as former Administrator of Field Operations Management, Division of Children and Family Services, Dept. of Human Services; Corrine Means, individually and in her official capacity as former coordinator on Substitute Care, Permanency Planning Unit, the Division of Children and Family Services, Dept. of Human Ser-**

vices; Nancy Marion, individually and in her official capacity as former Social Service Worker II, Permanency Planning Unit, Division of Children and Family Services, Dept. of Human Services; Barbara Keaton, individually and in her official capacity as former Social Service Worker II, Permanency Planning Unit, Division of Children and Family Services, Dept. of Human Services; Demetria Nesbitt, Chris Jackson, and John Breen, individually and in their official capacities, Defendants.

No. LR–C–91–801.

United States District Court,
E.D. Arkansas, W.D.

May 28, 1992.

Morris W. Thompson, Little Rock, Ark., for plaintiff.

Frederick S. Ursery, Little Rock, Ark., for defendants Chris Jackson, Demetria Nesbitt and Little Rock School Dist.

Bruce P. Hurlbut and Ruth H. Whitney, Little Rock, Ark., for defendants Bruce Limozaine, Corrine Means and Barbara Keaton.

Stuart P. Miller, Little Rock, Ark., for defendants Centers for Youth and Families and John Breen.

## MEMORANDUM OPINION

SUSAN WEBBER WRIGHT, District Judge.

This case involves an alleged sexual assault committed by a child in legal custody of the State of Arkansas. Dorothy J. claims that her son, Brian B., was sexually molested and raped by a fellow student, Louis C., while attending a special program for mentally-handicapped students at the Little Rock School District's (LRSD) Hall High School. She brings this lawsuit under 42 U.S.C. § 1983, alleging that the defendants' actions deprived her son of his rights to personal integrity and security under the Fourteenth Amendment to the United States Constitution.

The defendants can be separated into three groups: (1) Bruce Limozaine, Corrine Means, and Barbara Keaton (DHS defendants); [1] (2) the Centers for Youth and Families and John Breen (Centers defendants); and (3) the Little Rock School District, Demetria Nesbitt, and Chris Jackson (LRSD defendants). Each group has moved to dismiss under to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief may be granted. Dismissal on this ground is warranted only when it appears beyond doubt that the plaintiff can prove no set of facts in support of her claim which would entitle her to relief. *Hishon v. King & Spaulding*, 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *May v. C.I.R.*, 752 F.2d 1301 (8th Cir.1985). For the reasons explained below, the Court finds that the defendants' motions to dismiss should be and hereby are granted.

### I.

The facts alleged in the complaint, which must be taken as true when considering the motions to dismiss, are undeniably tragic and evoke much sympathy for this child and his mother. Brian B. was a student in the LRSD Community–Based Instruction (CBI) program, which is designed to teach life and social skills to educable mentally-handicapped children. On October 26, 1989 and again on October 27, 1989, he was sexually assaulted and raped by another student, Louis C., while in class at Hall High School. At the time, Louis C. was a ward of the Arkansas Department of Human Services (DHS) and had been placed in a foster care program with the Centers for Youth and Families (Centers), a private multiservice agency which derives much of its funding through contracts and

1. The plaintiff apparently has yet to effect service on Nancy Marion, a former employee of the Arkansas Department of Human Services (DHS).

grants from governmental agencies such as the DHS.

DHS employees Corrine Means, Nancy Marion, Barbara Keaton, and Bruce Limozaine were responsible for supervision of Louis C. and participated in the decision to place him with the Centers, with Ms. Marion approving his placement in the CBI program. Supervision of Louis C. at the Centers was assigned to employee and case manager John Breen. Demetria Nesbitt and Chris Jackson were employed by the LRSD as a teacher and aide, respectively, in the CBI program, and worked with both Brian B. and Louis C.

The DHS and Centers defendants were aware of Louis C.'s disposition for violence and sexually assaultive behavior, but decided to enroll Louis C. in the CBI program without taking adequate precautions to see that other students in the program were protected. The LRSD defendants also knew of Louis C.'s propensity for such behavior, but allowed the two boys to be left alone unsupervised.

The complaint does not specify when the DHS placed Louis C. with the Centers or when Louis C. initially was enrolled in the CBI program. It appears from the briefs of the plaintiff and the DHS defendants, however, that the alleged rape occurred at least two years after either of these events transpired. *See* DHS Memorandum Brief in Support of Motion to Dismiss at 5–6; Plaintiff's Response to DHS Defendants Motion to Dismiss at 5.

## II.

The Due Process Clause of the Fourteenth Amendment says that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." By its own terms, the clause protects only against such deprivations that can be fairly attributable to the deliberate actions (or inactions) of state or local government.[2] This avoids imposing on the state, its agencies, or officials, responsibility for conduct for which they cannot fairly be blamed.

Dorothy J. contends that the defendants deprived Brian B. of his liberty interest in being free from "unjustified intrusions on personal security." *Ingraham v. Wright*, 430 U.S. 651, 673, 97 S.Ct. 1401, 1413, 51 L.Ed.2d 711 (1977).[3] Liberally read, her complaint asserts two theories of liability under the Due Process Clause. First, she claims that the defendants failed to provide Brian B. with adequate protection against Louis C.'s violent assault. The affirmative duty to protect, she urges, arises from the special custodial relationship created by compulsory school attendance laws, Complaint ¶ 17, or from the special danger posed by placing Louis C. in a class with other handicapped students, Complaint ¶ 18. Second, she claims that Brian B.'s harm was caused by the customs, practices, or policies of the governmental entities. Complaint ¶¶ 20–21.

The DHS defendants say that dismissal of the complaint is warranted because the plaintiff has failed to allege the deprivation of a constitutionally protected interest. They argue that (1) the failure to protect an individual from private violence does not constitute a violation of due process under *DeShaney v. Winnebago County Dept. of Social Svcs.*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), and (2) Brian B.'s injuries were too remote a consequence of their actions under *Martinez v. California*, 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980). They also claim they are entitled to immunity under both state law and the doctrine of qualified immunity. Finally, they contend that the complaint lacks the specificity required to state a claim under section 1983. The Centers defendants like-

---

**2.** Similarly, 42 U.S.C. § 1983 creates liability against any person who violates the Constitution or federal law while acting "under color of any statute, ordinance, regulation, custom, or usage of any state or territory." This language usually is phrased more simply as a requirement that the plaintiff demonstrate that the defendant acted "under color of state law."

**3.** The plaintiff also claims that Brian B. was deprived of his right to "an appropriate free public education." Complaint ¶ 21. The Court does not express any opinion on the merits of the plaintiff's alternate characterization of Brian B.'s rights except to say that it adds nothing to her case.

wise ask the Court to dismiss the complaint on the grounds that no affirmative constitutional duty was owed to Brian B. under *DeShaney* and *Harpole v. Arkansas Dep't of Human Services,* 820 F.2d 923 (8th Cir. 1987). In addition, the Centers defendants argue that they are not "state actors" as required under section 1983 and that the complaint fails to allege the requisite "state of mind" necessary to sustain a due process violation. They further claim that Dorothy J. cannot sue in her individual capacity unless she alleges that *she* has been deprived of some liberty or property interest. The LRSD defendants urge dismissal because the allegations in the complaint, even if true, state only a cause of action under state tort law, not the Constitution.

The Court's role in analyzing the plaintiff's substantive due process claim is twofold. The Court must consider whether Brian B. "possessed a right arising under the fourteenth amendment to be protected by the state from harm inflicted by a third party." *Wells v. Walker,* 852 F.2d 368, 370 (8th Cir.1988), *cert. denied,* 489 U.S. 1012, 109 S.Ct. 1121, 103 L.Ed.2d 184 (1989). If he possessed this right, the Court then must determine "whether [the] defendants' conduct deprived [him] of it within the meaning of the due process clause." *Id.*

### III.

■ This case is different from those involving a teacher's sexual assault on a student. The principal distinction, of course, is that Brian B.'s injuries resulted at the hands of another student rather than from the actions of an employee subject to the government's immediate control. Contrast this, for example, with the facts in

*Stoneking v. Bradford Area School Dist.,* 882 F.2d 720 (3rd Cir.1989) (*Stoneking II*), *cert. denied,* 493 U.S. 1044, 110 S.Ct. 840, 107 L.Ed.2d 835 (1990). In that case, the court held that a school district and its supervisory officials may be liable for a custom, practice, or policy of deliberate indifference to such misconduct by *teachers.* Both the teacher who perpetrated the assault and the supervisory school officials were "state actors." That is, their actions were deemed to be government actions.[4]

Here, the victim was injured at the hands of a private individual who was neither an agent of the state nor employed by the state. Can it then be said that the *state* deprived him of his liberty without due process? The Supreme Court addressed this question in *DeShaney v. Winnebago County Dept. of Social Svcs.,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), holding that the government's failure to protect individuals from privately-inflicted wrongs generally cannot violate the Due Process Clause. The guardians of four-year-old Joshua DeShaney sued the Department of Social Services for its failure to protect the child from his father's beatings after being informed of possible abuse. The Court decided that there was no constitutional violation because the child was not in the government's custody and because the abuse occurred at the hands of a private party.

> [N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liber-

---

**4.** In *Stoneking v. Bradford Area School Dist.,* 856 F.2d 594 (3d Cir.1988) (*Stoneking I*), *vacated sub nom. Smith v. Stoneking,* 489 U.S. 1062, 109 S.Ct. 1333, 103 L.Ed.2d 804 (1989), the Third Circuit held that school officials have a constitutional duty to protect students from attacks by teachers. The basis for this duty arose from state compulsory education laws and other state statutes showing the state's desire to provide affirmative protection to students, as well as the broad common law duty owed by school administrators to protect students from the tortious or criminal conduct of teachers. The Supreme Court vacated and remanded that case for reconsideration in light of its decision in *DeShaney v. Winnebago County Dept. of Social Svcs.,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), discussed *infra.* In *Stoneking II* the court did not decide whether its previous holding survived *DeShaney,* 882 F.2d at 724, but affirmed on other grounds, namely the existence of a policy, practice, or custom of deliberate indifference to the student's constitutional rights.

ty, or property without "due process of law," but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means.... Its purpose was to protect the people from the State, not to ensure that the State protected them from each other. The Framers were content to leave the extent of governmental obligation in the latter area to the democratic political processes.

*Id.* 489 U.S. at 195–96, 109 S.Ct. at 1003.

In one sense, Louis C. was not a purely private third party at the time of the assault. He was in legal custody of the State of Arkansas—a "ward of the state" if you will. He had been placed in the State's foster care program, administered by the DHS defendants. The State thus stood *in loco parentis* ("in the place of a parent") to Louis C. But this did not transform Louis C. himself into a state actor. The Court is unaware of a single case (and does not wish to conceive one here) in which a foster child in legal custody of the state was deemed to be acting under color of state law. Louis C. was no more an agent of the state than someone incarcerated in state prison. *See Nishiyama v. Dickson County, Tennessee,* 814 F.2d 277, 286 n. 5 (6th Cir.1987) (en banc) (Wellford, J., dissenting) (inmate not an agent of sheriff or county); *Estate of Gilmore v. Buckley,* 787 F.2d 714, 721–22 (1st Cir.1986), *cert. denied,* 479 U.S. 882, 107 S.Ct. 270, 93 L.Ed.2d 247 (1986) (prison inmate on furlough was "in no sense an agent of the state"). *Cf. Martinez v. California,* 444 U.S. 277, 285, 100 S.Ct. 553, 559, 62 L.Ed.2d 481 (1980) (parolee was "in no sense an agent of parole board"). A contrary conclusion would expand the reach of federal civil rights law by bringing within the law's scope a myriad of private individuals with whose care the state has been entrusted.

Louis C.'s status as a private actor is fatal to the plaintiff's *Stoneking II*-type theory. In *Stoneking II* the Third Circuit found an independent basis of liability in the policies and customs of school officials which directly caused the underlying constitutional injury. Such liability was apart

from any special duty to protect owed by the school district to the child harmed. The court wrote "[n]othing in *DeShaney* suggests that state officials may escape liability arising from their policies maintained in deliberate indifference to actions taken by their subordinates," 882 F.2d at 725, and distinguished *DeShaney* because the abuse there "resulted at the hands of a private actor, whereas Stoneking's resulted from the actions of a state employee," *id.* at 724. The present case, however, lacks the linchpin of *Stoneking II,* namely, an underlying violation by a state actor. *See also Arroyo v. Pla,* 748 F.Supp. 56, 60 (D. Puerto Rico 1990) ("the determining factor in this case is that the death ... was caused solely by a private individual").

## IV.

If Louis C. was not a state actor, his assault was the sort of private violence that usually falls beyond the reach of the Due Process Clause under *DeShaney.* This is not the end of the matter for the plaintiff, however. *DeShaney* made clear that "in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals." 489 U.S. at 198, 109 S.Ct. at 1004–1005. Two cases primarily provide the basis for this rule. In *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), the Court held that the Eighth Amendment requires a state to provide adequate medical care to incarcerated prisoners because a prisoner is unable " 'by reason of the deprivation of his liberty [to] care for himself.' " *Id.* 429 U.S. at 103–104, 97 S.Ct. at 290–291 (quoting *Spicer v. Williamson,* 191 N.C. 487, 490, 132 S.E. 291, 293 (1926)). The Court extended this analysis in *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), holding that substantive due process requires a state to provide involuntarily-committed mental patients with such services as are necessary to ensure their "reasonable safety" from themselves and others. *Id.* 457 U.S. at 314–325, 102 S.Ct. at 2457–2463. It indicated in dictum that a state also is obligated to

provide such individuals with "adequate food, shelter, clothing, and medical care." *Id.* at 315, 102 S.Ct. at 2457–2458. The rationale was the same; when the state deprives a person of his liberty and holds him in custody against his will, the state assumes a corresponding affirmative duty to provide for his safety and general well-being.

From these cases, the *DeShaney* Court concluded that "[t]he affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." 489 U.S. at 200, 109 S.Ct. at 1006. *Accord Wideman v. Shallowford Community Hospital, Inc.,* 826 F.2d 1030, 1035–36 (11th Cir.1987) ("The key concept is the exercise of dominion or restraint by the state. The state must somehow significantly limit an individual's freedom or impair his ability to act on his own before it can be constitutionally required to care and provide for that person."). The question, then, is whether the substantive component of the Fourteenth Amendment's Due Process Clause imposed upon the defendants an affirmative duty to protect Brian B. while he was a student in the special program for mentally-disabled children.

The Supreme Court has never recognized a duty of protection beyond the cases of incarcerated prisoners and involuntarily-committed mental patients. Lower courts, however, have not treated this as an exhaustive list. This perhaps is due to a statement in the Supreme Court's opinion in *Martinez v. California,* 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980). In *Martinez* the Court considered whether state officials could be held liable under the Fourteenth Amendment for failure to protect a private citizen who died at the hands of a parolee. The Court did not squarely confront the issue of the state's affirmative duty to provide protection, but rather affirmed dismissal of the claim on the narrower ground that the causal connection between the decision to release the parolee and the murder was too remote to hold the government liable. This was "[r]egardless of whether, as a matter of state tort law, the parole board could be said either to have had a 'duty' to avoid harm to his victim or to have proximately caused her death." *Id.* 444 U.S. at 285, 100 S.Ct. at 559 (citations omitted).

The remoteness of the parole board's action turned upon three factors: (1) the murder occurred five months after the parolee's release; (2) the parolee was not an agent of the parole board; and (3) the parole board was not aware that the victim faced any "special danger" different from that which the public at large faced from parolees. *Id.* The Court went on to say that

> [w]e need not and do not decide that a parole officer could never be deemed to "deprive" someone of life by action taken in connection with the release of a prisoner on parole. But we do hold that at least under the particular circumstances of this parole decision, appellants' decedent's death is too remote a consequence of the parole officers' action to hold them responsible under the federal civil rights law.

*Id.* The door thus was left open for finding a duty to protect outside the strictly custodial setting of a prison or mental hospital. This duty, of course, arises from the state's relationship to the victim, not to the attacker.

Initially, the Court must determine whether the *Estelle–Youngberg* analysis should be extended to public schools. Are schools sufficiently analogous to prisons or mental hospitals to impose on school officials a similar affirmative duty to protect? To put it another way, do compulsory attendance laws or other factors create a special "custodial" relationship between the state and the student that gives rise to such a duty? The only appellate case to date to squarely confront this issue is *J.O. v. Alton Community Unit School Dist. 11,* 909 F.2d 267 (7th Cir.1990). In that case, parents sued the school district and its officials under section 1983 as a result of the alleged sexual molestation of their children by a teacher. They did not name the alleged molester in the civil rights

counts of their complaint, nor did they allege, like the plaintiffs in *Stoneking II,* that the school defendants promoted school policies that encouraged a climate where children were victimized by teachers. Rather, they based their claim for a deprivation of a constitutionally protected liberty interest on a purported "special relationship" between the school defendants and students.

The Seventh Circuit rejected this claim because "the government, acting through local school administrations, has not rendered its schoolchildren so helpless that an affirmative constitutional duty to protect arises." *Id.* at 272. Instead, "[w]hatever duty of protection does arise is best left to laws outside the Constitution." *Id.* It reasoned that

> [t]he state's custody over their person is the most distinguishing characteristic in the cases of the mental patient and the prisoner; these people are unable to provide for basic human needs like food, clothing, shelter, medical care, and reasonable safety. At most, the state might require a child to attend school, but it cannot be suggested that compulsory school attendance makes a child unable to care for basic human needs. The parents still retain primary responsibility for feeding, clothing, sheltering, and caring for the child. By mandating school attendance for children under the age of sixteen, the state of Illinois has not assumed responsibility for their entire personal lives; these children and their parents retain a substantial freedom to act. The analogy of a school yard to a prison may be a popular one for school-age children, but we cannot recognize constitutional duties on a child's lament. Schoolchildren are not like mental patients and prisoners such that the state has an affirmative duty to protect them.

*Id.* at 272–73 (citations omitted). *Accord Russell ex rel. Russell v. Fannin County School District,* 784 F.Supp. 1576, 1582–83 (N.D.Ga.1992). *See also Reeves ex rel. Jones v. Besonen,* 754 F.Supp. 1135, 1140 (E.D.Mich.1991) (no custodial relationship found in context of extracurricular school activities).

Other courts have taken a different view. In *Stoneking I* the Third Circuit imposed a constitutional duty to protect because, among other things, "students are in what may be viewed as functional custody of the school authorities, at least at the time they are present." 856 F.2d at 601. On remand, the court noted that this conclusion "[a]rguably ... is not inconsistent with the *DeShaney* opinion." *Stoneking II,* 882 F.2d at 723. *DeShaney* had suggested that a child removed by the state from free society and placed in a foster home operated by state agents might be sufficiently analogous to incarceration or institutionalization to give rise to an affirmative duty to protect. 489 U.S. at 201 n. 9, 109 S.Ct. at 1006 n. 9. With this in mind, the Third Circuit recognized that children subject to compulsory school attendance who have been mistreated by school district employees "may not be dissimilar to that of children in foster homes mistreated by their foster parents." 882 F.2d at 724. But the court preferred not to rest its decision on an affirmative duty to protect such students in this situation, finding instead sufficient evidence of deliberate indifference to teacher sexual misconduct.

■ Four district courts have indicated a willingness to find or assume a custodial relationship in school settings sufficient to give rise to a constitutional duty to protect. *Pagano ex rel. Pagano v. Massapequa Public Schools,* 714 F.Supp. 641 (E.D.N.Y. 1989), involved a student who alleged that he had suffered seventeen attacks at the hands of other students and that school district officials knew of such attacks and had promised to prevent them in the future. The court said that "[w]e consider elementary school students who are required to attend school, the truancy laws still being in effect, to be owed *some* duty of care by defendants which may or may not rise to the level required in [prison or institutional] circumstances." *Id.* at 643 (emphasis in original). Relying on footnote nine in *DeShaney* and a pre-*DeShaney* case from the Second Circuit, *Doe v. New York City Dept. of Social Services,* 649 F.2d 134 (2d Cir.1981) (duty to protect ex-

ists in a foster home situation), the court concluded that the facts in its case "appear to be closer to those of *Doe* than *DeShaney* in that the victim and the perpetrator(s) were under the care of the school in its *parens patriae* capacity at the time these alleged incidents occurred." 714 F.Supp. at 643.

In *Tilson v. School Dist. of Philadelphia*, Civ.A. No. 89–1923, 1990 WL 98932 (E.D.Pa. July 13, 1990), a case involving sexual molestation by a teacher in a state without compulsory attendance laws, the court reasoned that "the tender years of preschool children and their inability to defend themselves against adult mistreatment favor imposing the same constitutional duty to provide for their reasonable safety as for institutionalized or incarcerated individuals." It dismissed the case, however, because there was no evidence of deliberate indifference to protecting such children.

The court in *D.R. v. Middle Bucks Area Vocational Technical School*, Civ.A. Nos. 90–3018, 90–3060, 1991 WL 14082 (E.D.Pa. Feb. 1, 1991), held that compulsory attendance laws established a custodial relationship between the school district and students, thus creating an affirmative constitutional duty to protect such students from attacks by other students. This duty was complemented by state law giving school officials *in loco parentis* standing to take any action necessary to prevent disciplinary infractions and educationally disruptive behavior. Nevertheless, the court concluded that the plaintiffs had failed to allege the requisite reckless indifference to support a section 1983 claim. The decision was affirmed by a Third Circuit panel in *D.R. v. Middle Bucks Area Vocational Technical School*, Nos. 91–1136, 91–1137, 1991 WL 276292 (3d Cir. Dec. 31, 1991), but only after it rejected the notion of a special custodial relationship in the school setting, citing the Seventh Circuit's opinion *Alton Community.* The panel's ruling subsequently was vacated on January 24, 1992 in favor of a rehearing en banc.

Finally, in *Waechter v. School Dist. No. 14–030*, 773 F.Supp. 1005 (W.D.Mich.1991),

a handicapped student died after his teacher required him to run 350 yards as punishment for talking in line. The court found that a custodial relationship existed between the student and teacher because the teacher was aware of the decedent's limitations and he undertook to supervise the decedent's activities during recess, thus exercising control over the student's "personal liberty." The situation was analogized to *Webb v. McCullough*, 828 F.2d 1151 (6th Cir.1987), a pre-*DeShaney* case in which the Sixth Circuit found that a high school teacher stands in an *in loco parentis* relationship with his students which heightens the teacher's responsibility for the students' well-being.

These cases are unpersuasive. State laws giving school officials *in loco parentis* authority over schoolchildren are of little consequence in section 1983 litigation. A duty which arises under the laws of a particular state does not necessarily arise under the United States Constitution; state laws do not create duties of constitutional proportions. *See Archie v. City of Racine*, 847 F.2d 1211, 1215–18 (7th Cir.1988) (en banc), *cert. denied*, 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 809 (1989). "A state ought to follow its law, but to treat a violation of state law as a violation of the Constitution is to make the federal government the enforcer of state law. State rather than federal courts are the appropriate institutions to enforce state rules." *Id.* at 1217 (citing *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984)); *see also DeShaney*, 489 U.S. at 201–03, 109 S.Ct. at 1006–1007 (disavowing any duty created under the Due Process Clause by state statutory requirements). More generally, the Supreme Court has recognized in another context that "the concept of parental delegation" as a source of teacher authority is not entirely "consonant with compulsory education laws." *New Jersey v. T.L.O.*, 469 U.S. 325, 336, 105 S.Ct. 733, 740, 83 L.Ed.2d 720 (1985); *Ingraham v. Wright*, 430 U.S. 651, 662, 97 S.Ct. 1401, 1407, 51 L.Ed.2d 711 (1977).

■ While state laws do not create constitutional duties, they may create or define the circumstances in which a claim under the Due Process Clause may arise. For instance, as Judge Easterbrook noted in *Archie*, showing that one has been deprived of "property" often depends on showing a legitimate claim of entitlement under state law. 847 F.2d at 1217. State criminal and prison laws and regulations also create the custodial environment that triggers the Eighth Amendment duties of care and protection under *Estelle*. The Court, however, must reject the broad view of "custody" based on state compulsory attendance laws taken in the foregoing cases, and argued here by the plaintiff. That view would expand constitutional duties of care and protection to millions of schoolchildren. School officials would be subject to section 1983 liability anytime a child skinned his knee on the playground or was beat-up by the school bully, so long as the requisite "state of mind" was shown. More seriously, with the epidemic of deadly violence on many school campuses today, teachers would be constitutionally obliged to assume roles similar to policemen or even prison guards in protecting students from other students. The precise contours of an affirmative duty to care and protect would be much more difficult to define in public schools. Would such a duty be coextensive with the state's obligations under *Estelle–Youngberg*? If not, where would the line be drawn? School officials who are too restrictive likely would be charged under the same Due Process Clause with violating students' rights not to be treated like incarcerated prisoners or involuntarily-committed mental patients.

Most importantly, these cases fail to address the "wholly different circumstances," *Ingraham*, 430 U.S. at 669, 97 S.Ct. at 1411, in which schoolchildren and prisoners stand. Incarceration deprives the prisoner of "the freedom 'to be with family and friends and to form the other enduring attachments of normal life.' " *Id.* (quoting *Morrissey v. Brewer*, 408 U.S. 471, 482, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). Even with compulsory education laws, "the public school remains an open institution.

Except perhaps when very young, the child is not physically restrained from leaving during school hours; and at the end of the school day, the child is invariably free to return home. Even while at school, the child brings with him the support of family and friends...." *Id.* at 670.

The Court has no occasion in this case to consider whether the "tender years" of preschool children favor an affirmative constitutional duty to protect. Perhaps such a duty should be imposed with respect to disabled students based on a similar diminished capacity to defend themselves. *DeShaney*, however, seems to foreclose this as well, since "[t]he affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." 489 U.S. at 200, 109 S.Ct. at 1006. No one would argue that a disability can curtail a student's ability to defend himself in a dangerous situation. Yet, there is a distinction between a student's own limitation and one that is placed on him by the state. "[I]t is the State's affirmative act of restraining the individual's freedom to act on his own behalf ... which is the 'deprivation of liberty' triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means." *Id.* (footnote omitted). Absent additional limits on the disabled student's freedom to act other than those routinely part of the school day, the Court cannot say that an affirmative duty to protect exists based solely on the handicap itself.

The foster home cases do not help the plaintiff here either. Although the situation of a schoolchild is closer to that of a foster child than to a prisoner, the analogy is not decisive. As previously mentioned, the Supreme Court in *DeShaney* left open the possibility that the Due Process Clause may impose an affirmative duty to protect children in foster homes from mistreatment at the hands of their foster parents. *See id.* at 201 n. 9, 109 S.Ct. at 1006 n. 9 (citing *Doe v. New York City Dept. of Social*

*Services,* 649 F.2d 134, 141–42 (2d Cir. 1981), *after remand,* 709 F.2d 782, *cert. denied sub nom. Catholic Home Bureau v. Doe,* 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983); *Taylor ex rel. Walker v. Ledbetter,* 818 F.2d 791, 794–97 (11th Cir.1987) (en banc), *cert. denied sub nom. Ledbetter v. Taylor,* 489 U.S. 1065, 109 S.Ct. 1337, 103 L.Ed.2d 808 (1989)). *See also Yvonne L. v. New Mexico Dept. of Human Svcs.,* 959 F.2d 883 (10th Cir.1992). Even the Seventh Circuit, which refused to find a special custodial relationship between teachers and students in *Alton Community,* recognized in *K.H. ex rel. Murphy v. Morgan,* 914 F.2d 846, 852 (7th Cir.1990), a constitutional right "of a child in state custody not to be handed over by state officers to a foster parent or other custodian, private or public, *whom the state knows or suspects to be a child abuser"* (emphasis in original).[5] Judge Posner, writing for the court, distinguished *DeShaney:*

> Here, in contrast, the state removed a child from the custody of her parents; and having done so, it could no more place her in a position of danger, deliberately and without justification, without thereby violating her rights under the due process clause of the Fourteenth Amendment than it could deliberately and without justification place a criminal defendant in a jail or prison in which his health or safety would be endangered, with violating his [constitutional] rights....
>
> ....
>
> [T]he State of Illinois has no constitutional obligation to protect children from physical or sexual abuse by their parents. The state could have left K.H. to the tender mercies of her parents without thereby violating her rights under the Constitution. But having removed her from their custody the state assumed at least a limited responsibility for her safety. If the fire department rescues you from a fire that would have killed

you, this does not give the department a constitutional license to kill you, on the ground that you will be no worse off than if there were no fire department. The state, having saved a man from a lynch mob, cannot then lynch him, on the ground that he will be no worse off than if he had not been saved.... Once the state assumes custody of a person, it owes him a rudimentary duty of safekeeping no matter how perilous his circumstances when he was free.

*Id.* at 849. Consistent with this distinction, *Milburn v. Anne Arundel County Dept. of Social Services,* 871 F.2d 474, 476 (4th Cir.), *cert. denied,* 493 U.S. 850, 110 S.Ct. 148, 107 L.Ed.2d 106 (1989), emphasized the state's lack of responsibility for a child's *voluntary* placement by the natural parents in an abusing private foster home.

■ The present lawsuit lacks the essential component of these cases, namely, a state-imposed restraint of the foster child's freedom by taking custody of the child and placing him in an abusive foster home. Brian B. was not under a similar restraint; he neither was in state custody either directly or by virtue of school attendance laws, nor did the state remove him involuntarily from his home and place him in the CBI program.

Prior to *DeShaney* the Eighth Circuit took a very narrow view of the constitutional duty to protect beyond the strictly custodial settings of incarceration or institutionalization. In *Harpole v. Arkansas Dept. of Human Services,* 820 F.2d 923, 927 (8th Cir.1987), the court expressly rejected the expansive reading of *Estelle* and *Martinez* by the Third Circuit in *Estate of Bailey ex rel. Oare v. County of York,* 768 F.2d 503 (3d Cir.1985), and the Fourth Circuit in *Jensen v. Conrad,* 747 F.2d 185 (4th Cir.1984), *cert. denied,* 470 U.S. 1052, 105 S.Ct. 1754, 84 L.Ed.2d 818 (1985), that special relationships requiring affirmative protection can exist outside of the prison envi-

---

**5.** *DeShaney* took a narrower view in suggesting that the foster home must be *operated by state*

*agents* to be sufficiently analogous to incarcera-

ronment.[6]

In *Harpole* the Arkansas Children's Hospital discharged a small child to his mother's care on three occasions after he had been admitted because of apnea, which is a sudden cessation of breathing. The mother's three other children previously had died, two as a result of Sudden Infant Death Syndrome and one as a result of apnea. An investigation, however, showed no evidence of abuse or neglect. After the third discharge, the child stopped breathing and died. The mother had forgotten to activate the apnea monitor, as she had done the day her third child had stopped breathing and died. The deceased child was always in his mother's legal custody, and the court of appeals found that no state law duties pertaining to dependent-neglected children had been violated. In considering whether the state stood in a special relationship with the child, the court explained:

> The facts in the present case do not support the finding of a special relationship because the massive state control found in the prison environment is absent here. Without that control there is no constitutionally mandated duty to protect one private citizen from another. *We do not believe that the concept of special relationships was intended to extend beyond prison or prison-like environments.*

820 F.2d at 927 (emphasis added).

As we shall see, the narrow view of special relationships in *Harpole* has been ignored in post-*DeShaney* Eighth Circuit cases. Nevertheless, it is still instructive for defining the type of custodial relationship that triggers an affirmative duty of care and protection. For the reasons stated in *Ingraham* and *Alton Community*,

the "massive state control" restricting the freedom to act found in the prison environment is absent from the public school setting. Taken together, *Ingraham, Alton Community,* and *Harpole* weigh against finding any "custodial" surroundings at Hall High School sufficiently analogous to a prison or prison-like environment to impose on the state an affirmative duty to protect Brian B. from Louis C.

## V.

There is a variation on the "special relationship" doctrine that the plaintiff argues with great force. Some courts have been willing to find a constitutional duty to protect when the government takes an affirmative step to place a person in danger, regardless of whether there is a custodial relationship or whether the underlying violent act was committed by a private third party. In such cases, to borrow the typically-trenchant words of Judge Posner, "the state would be a doer of harm rather than merely an inept rescuer, just as the Roman state was a doer of harm when it threw Christians to lions." *Morgan,* 914 F.2d at 849. *DeShaney* arguably acknowledged this possibility in pointing out that "[w]hile the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them." 489 U.S. at 201, 109 S.Ct. at 1006.

At this point the state's legal custody of Louis C. again becomes significant due to the control it gave the state over Louis C.'s placement. The plaintiff urges that a duty to protect an individual arises when the state helped create the risk of harm to that individual. Here, she says that the DHS

tion or institutionalization. *See* 489 U.S. at 201 n. 9, 109 S.Ct. at 1006 n. 9.

6. *Estate of Bailey* involved the death of a child at the hands of his mother's abusive boyfriend after the county child welfare agency had investigated charges of abuse and had returned the child to his mother's custody. In *Jensen* two children died after being brutally beaten by their guardians.

The Fourth Circuit noted "some of the factors" that should be included in a "special

relationship" analysis: (1) whether the victim or the perpetrator was in legal custody at the time of the incident, or had been in legal custody prior to the incident; (2) whether the state has expressly stated its desire to provide affirmative protection to a particular class of individuals; (3) whether the state knew of the claimants' plight. *Jensen,* 747 F.2d at 194 n. 11. The second and third factors may no longer be relevant in light of *DeShaney*. See *infra* the discussion in footnote 7.

and the Centers defendants knew that Louis C. posed a danger to vulnerable persons like Brian B., but approved his placement in the CBI program with such persons anyway.[7] This was done without informing all concerned of Louis C.'s violent propensities or making certain that the school took adequate precautions.

As noted above, *Martinez* left open the question of whether the state could ever be deemed to "deprive" someone of life by action taken in connection with the release of a prisoner. In an opinion written by Judge Posner, the Seventh Circuit addressed this question in *Bowers v. DeVito*, 686 F.2d 616 (7th Cir.1982). There, a woman was murdered by a schizophrenic with a history of criminal violence after he was released from a state mental hospital. Her estate filed a section 1983 claim asserting that the state had reason to know that the former patient was dangerous and thus acted recklessly in releasing him. The Seventh Circuit disagreed, saying that "there is no constitutional right to be protected by the State against being murdered by criminals or madmen." *Id.* at 618. Other courts presented with similar facts have dismissed section 1983 claims against state officials for injuries or deaths to members of the general public caused by parolees or escaped inmates. *See, e.g., Commonwealth Bank & Trust Co., N.A. v. Russell*, 825 F.2d 12 (3rd Cir.1987) (escaped prisoner murdered nearby residents); *Ketcham v. Alameda County*, 811 F.2d 1243 (9th Cir. 1987) (escaped inmate raped woman at location over 50 miles from inmate's rehabilitation facility two months and nine days af-

ter escape); *Janan v. Trammell*, 785 F.2d 557, 560 (6th Cir.1986) (parolee who had threatened police officer's wife and had violated parole by failing to report to parole officer murdered someone who was "simply a member of the public at large"); *Fox v. Custis*, 712 F.2d 84 (4th Cir.1983) (state corrections employees failed to reincarcerate dangerous parolee who subsequently committed criminal acts against three women); *Humann v. Wilson*, 696 F.2d 783 (10th Cir.1983) (per curiam) (victim was raped by inmate of a community corrections facility which permitted a good deal of freedom and interaction in the community).

Some courts have held that even where state officials are aware of a risk of harm to a particular individual, no section 1983 claim is stated against the officials if the released prisoner caused that harm. *See Estate of Gilmore v. Buckley*, 787 F.2d 714 (1st Cir.1986) (plaintiff's decedent was murdered by man who had previously threatened her life and had been hospitalized for mental evaluation as a result of her complaints); *Jones v. Phyfer*, 761 F.2d 642 (11th Cir.1985) (furloughed prisoner raped plaintiff who was instrumental in his prior conviction for breaking and entering her home). Language in *DeShaney* that "[t]he affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him," 489 U.S. at 200, 109 S.Ct. at 1006, forecloses the possibility of a special relationship based solely on the state's *awareness* of a specific risk of harm to a

---

**7.** For the purpose of this argument, the Court will assume without deciding that the Centers defendants have a sufficiently close connection with the State of Arkansas to be deemed "state actors."

State action may be found where the state creates the legal framework governing the conduct, *e.g., North Georgia Finishing, Inc. v. Di-Chem, Inc.*, 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975), delegates its authority to the private actor, *e.g., West v. Akins*, 487 U.S. 42, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988), or is extensively intertwined with the private entity, *e.g., Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982) (joint venture), *Burton v. Wilmington Parking Authori-*

*ty*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961) (mutual benefit). As the Supreme Court observed in *NCAA v. Tarkanian*, 488 U.S. 179, 109 S.Ct. 454, 462, 102 L.Ed.2d 469 (1988), "in the usual case we ask whether the State provided a mantle of authority that enhanced the power of the harm-causing individual actor."

Although the Court does not decide this question, it is likely that the Centers defendants were "state actors" based on the fact that Louis C. was a ward of the State and the State was in effect providing for his care *through* the Centers defendants. *See, e.g., Taylor v. First Wyoming Bank, N.A.*, 707 F.2d 388, 390 (9th Cir.1983); *Perez v. Sugarman*, 499 F.2d 761, 763–65 (2d Cir.1974); *McAdams v. Salem Children's Home*, 701 F.Supp. 630, 633–36 (N.D.Ill.1988).

particular individual, even where the state has indicated its willingness to protect that person against the danger, *see, e.g., Balistreri v. Pacifica Police Dept.,* 855 F.2d 1421, 1425–26 (9th Cir.1988).[8]

The court in *Bowers,* however, limited its holding to situations where the state played no active part in placing the injured person in a position of danger. Judge Posner explained:

> We do not want to pretend that the line between action and inaction, between inflicting and failing to prevent the infliction of harm, is clearer than it is. If the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit.

*Id.* at 618. He concluded, however, that "[t]he defendants in this case did not place Miss Bowers in a place or position of danger; they simply failed adequately to protect her, as a member of the public, from a dangerous man." *Id.* In his view, the act of releasing a potentially dangerous person from state custody was not the same as acting to place the plaintiff in danger.

The contours of this type of "special relationship" have been developed further in various factual situations. In *Nishiyama v. Dickson County, Tennessee,* 814 F.2d 277 (6th Cir.1987) (en banc), the Sixth Circuit reversed the dismissal of a section 1983 action brought against a county and its officials after an prisoner on "trusty" status cruising alone in a sheriff's patrol car stopped and murdered a young woman. The sheriff's department had a policy and practice of permitting the inmate to have unsupervised use of such vehicles. The court noted that the custodial relationship allowed the sheriff to direct the prisoner's actions in a way that was absent in *Martinez.* In addition, the defendants allegedly knew that the prisoner was stopping unwitting motorists under the aura of the authority the patrol car represented, but

did nothing to stop or disavow the inmate's use of the car for such purposes. The court found the cases cited above concerning parolees and escaped prisoners inapplicable because "in none of [those] cases did the state officers by their acts facilitate the crime by providing the criminal with the necessary means and the specific opportunity to commit his crime." *Id.* at 281.

*Cornelius v. Town of Highland Lake, Ala.,* 880 F.2d 348 (11th Cir.1989), *cert. denied,* 494 U.S. 1066, 110 S.Ct. 1784, 108 L.Ed.2d 785 (1990), involved a town clerk who was abducted at knifepoint from town hall and terrorized by prison inmates assigned to a community work squad in the town. She sued both town and prison officials under section 1983. The Eleventh Circuit, relying on *Nishiyama,* found that a combination of factors created a special relationship between the town clerk and the government that gave rise to an affirmative duty of protection. Prison officials created the work squad, assigned inmates (some of them dangerous) to work on the squad, and permitted town officials to supervise the inmates while they worked. Town officials contacted the prison to obtain inmate labor, accepted the inmates assigned to them, and undertook to supervise them. In addition, the status of the plaintiff as town clerk under the control of the town officials caused her to regularly be exposed to the work squad, thus increasing her vulnerability. All of this "affirmatively created a potentially dangerous situation." *Id.* at 357. Especially significant was the prison's conduct in assigning dangerous prisoners to the squad and entrusting their supervision to town officials with no training, as well as the town officials' actions in assuming custody of the dangerous prisoners without proper training, which " 'set in motion the specific forces that allowed [the inmates] to commit [their] crime.' " *Id.* (quoting *Nishiyama,* 814 F.2d at 281).

In *Swader v. Commonwealth of Virginia,* 743 F.Supp. 434 (E.D.Va.1990), the district court used similar reasoning to rule

---

**8.** In cases where the state affirmatively acts to put a person in danger, knowledge that an individual poses a risk of harm to another identifiable group or person is necessary to satisfy the "state of mind" requirement for a due process violation.

that a mother whose child was raped and killed by an unsupervised prisoner had adequately alleged a special relationship based on her residence on state prison grounds. The child lived with her mother, a nurse at the prison, in a house located on the complex grounds, but outside the fenced-in portion of the prison where the inmates were lodged. Prison regulations required that all inmates working outside the fenced-in portion were to be accompanied by a guard. Applying the factors set forth in *Jensen v. Conrad*, 747 F.2d 185 (4th Cir.1984), the court found that the defendants were aware that the child "faced a special danger in that she was required to live on prison property in an area where inmates, some of whom were sentenced to life, were allowed to work if accompanied by a guard." 743 F.Supp. at 439. Rejecting the strict custody requirement found necessary in other cases, the court said placement by the state in a dangerous environment within the four walls of a prison complex or within the perimeter of prison property was "a distinction without a difference." *Id.* The court also found that the supervision regulation showed a clear intention by the state protect those individuals who lived on prison grounds, as well as and an awareness of the potential dangers they faced from unsupervised inmates. "[The] plaintiff's decedent was placed in an environment not perfectly analogous to the 'free world' of Joshua DeShaney, but closer to a situation analogous to incarceration or institutionalization were the State exercises a greater degree of control." *Id.* at 442.

The Ninth Circuit in *Wood v. Ostrander*, 879 F.2d 583 (9th Cir.1989), *cert. denied*, — U.S. —, 111 S.Ct. 341, 112 L.Ed.2d 305 (1990), held that a section 1983 lawsuit could proceed against a state trooper who allegedly left a female passenger of an impounded vehicle stranded at night in a high-crime area, resulting in her rape by a stranger from whom she accepted a ride. A triable issue of fact existed as to whether the trooper's conduct in arresting the driver, taking the car, and leaving the woman behind " 'affirmatively placed [her] in a position of danger.' " *Id.* at 589–90 (quoting *Ketcham*, 811 F.2d at 1247). The Eleventh Circuit, however, reached the opposite conclusion on similar facts in *Courson v. McMillian*, 939 F.2d 1479 (11th Cir. 1991). *See also Hilliard v. City & County of Denver*, 930 F.2d 1516 (10th Cir.1991).

In contrast to these cases, the Eighth Circuit in *Harpole* disavowed any duty to protect outside the strict custodial environment of a prison or prison-like setting. The first crack in *Harpole*, however, appeared in the pre-*DeShaney* case *Wells v. Walker*, 852 F.2d 368 (8th Cir.1988). *Wells* involved an inmate who committed murder after he was released from custody due to prison overcrowding. The state transported him to the closest commercial transportation pick-up point, which was a store that also served as a bus station. He shortly thereafter murdered the store owner. The district court relied on *Harpole* in concluding that the store owner had no constitutional right to be protected from the inmate's actions once he was freed. Disagreeing, the Eighth Circuit found that "*Harpole*'s requirement of a prison-related environment is satisfied in this case by the transportation link between the prison and [the] store," *id.* at 370—a rather tenuous connection to say the least. In any event, the court did not need to find this nexus because it then announced that an affirmative right to protection in favor of a victim of private violence may arise first, when a " 'special custodial or other relationship,' " *id.* (quoting *Fox*, 712 F.2d at 88), exists between a particular individual and the state, or second, "when the state affirmatively places a particular individual in a position of danger the individual would not otherwise have been in," *id.* (citing *Bowers*, 686 F.2d at 618) (also citing with approval *Nishiyama*, *Ketcham*, *Estate of Gilmore*, and *Jensen* ).[9] The alleged conduct of the defendants "had the result of placing [the store owner], unlike members of the gener-

---

9. Although *Wells* drew a distinction between "special custodial or other relationships" and an affirmative act of the state that places a person in danger, most courts view the latter merely as one species of a "special relationship." *See, e.g., Balistreri*, 855 F.2d at 1425; *Ketcham*, 811 F.2d at 1247; *Estate of Gilmore*, 787 F.2d at 722.

al public, in a unique, confrontational encounter with a person whom plaintiffs allege had exhibited violent propensities," *id.* at 371, thus creating a special relationship and the concomitant duty to protect. Dismissal was affirmed, however, because the court of appeals believed that the plaintiff could show nothing more than ordinary negligence by the defendants, thus lacking the requisite "state of mind" necessary to make out due process violation.

*Wells*, it would seem, significantly departed from *Harpole* without really saying so. It extended the special relationship doctrine beyond the strict custodial limits imposed by *Harpole* to include "other" sorts of relationships between an individual and the state. And like the Seventh Circuit in *Bowers*, it recognized that an affirmative duty to protect arises when the state places a person in a position of danger. *Wells* still acknowledged, however, that some connection with a prison or prison-like setting was required under *Harpole*, no matter how remote or contrived such a connection was.

The crack grew after *DeShaney*. In *Freeman v. Ferguson*, 911 F.2d 52 (8th Cir.1990), the court of appeals was faced with a situation in which it was alleged that a woman and her daughter had met violent and untimely deaths at the hands of her estranged husband, at the time the husband was under a restraining order which the police chief, who was his close friend, instructed police officers not to enforce. The district court had dismissed the complaint relying on *DeShaney*. In reversing the dismissal, the Eighth Circuit explained

that *DeShaney* left unclear "how large a role the state must play in the creation of a danger and in the creation of vulnerability before it assumes a corresponding duty to protect." *Id.* at 55. However, the court said that *DeShaney* "established the possibility that a constitutional duty to protect an individual against private violence may exist in a non-custodial setting if the state has taken affirmative action which increases the individual's danger of, or vulnerability to, such violence beyond the level it would have been absent state action." *Id.* The allegation in that case was distinguishable from *DeShaney* because

> [i]t presents a claim that the violence the decedents were subjected to was not solely the result of private action, but that it was also the result of an affirmative act by a state actor to interfere with the protective services which would have otherwise been available in the community—with such interference increasing the vulnerability of decedents to the actions of [the estranged husband] and possibly ratifying or condoning such violent actions on his part.

*Id.* at 54. [10]

*Harpole* and its requisite prison or prison-like setting was virtually ignored in *Wells* and never even mentioned in *Freeman*. [11] One can only conclude that outside of its usefulness in defining custodial relationships *Harpole* has been overruled in substance if not in name. It also is apparent that the doctrine of special relationships in the Eighth Circuit is less than precise and not yet settled.

**10.** An Eighth Circuit panel extended the special relationship doctrine to the outer limits in *Gregory v. City of Rogers, Ark.*, 921 F.2d 750 (8th Cir.1990), *vacated and reh'g en banc granted*, 939 F.2d 524 (8th Cir.1991). In that case, two intoxicated passengers crashed their car, killing one and seriously injuring the other, after driving off following the arrest of their "designated driver" (who was sober) on an outstanding arrest warrant. The complaint alleged that the police officers violated their due process rights by removing their driver without detaining or otherwise safeguarding them in their intoxicated condition. The district court granted summary judgment to the defendants because under *DeShaney* because the intoxicated individuals were not physically restrained and because the

undisputed facts did not support a finding of anything other than negligence. The panel reversed, relying on *Freeman*, *Wood*, *Cornelius*, and the pre-*DeShaney* cases of *Wells* and *White v. Rochford*, 592 F.2d 381, 383 (7th Cir.1979). It held that the police officers had *created* the dangerous situation and rendered the passengers more vulnerable by removing the designated driver they had taken the precaution of appointing. The panel's opinion, however, subsequently was vacated in favor of a rehearing en banc.

**11.** *Gregory*, discussed in footnote 10, also failed to mention *Harpole*.

■ With these cases in mind and taking the allegations of the complaint as true, the Court must decide whether a special relationship existed between the state and Brian B. by virtue of the state's placement of Louis C. in the CBI program at Hall High School. The state's legal custody of Louis C. gave the DHS and the Centers defendants control over his enrollment in the CBI program. They were aware of Louis C.'s propensity for violent assaults .when they affirmatively acted to place him in the program. They thus had notice that Louis C.'s presence in the class posed a possible threat not to the public at large, but specifically to his mentally-disabled classmates. Putting Louis C. with these students without adequate protective measures created a potentially dangerous situation and may have rendered the students more vulnerable to a violent attack than they otherwise would have been without the state's action. These circumstances, one could argue, make this case like *Wells*, where the state placed a dangerous person in close proximity to an unsuspecting individual (as opposed to the general public) without warning her of the danger or taking steps to provide adequate protection.

On the other hand, it appears that the alleged rape occurred at least two years after Louis C. had been assigned to the Centers for Youth and Families or enrolled in the CBI program. Whether this is sufficiently remote under *Martinez* not to constitute a "deprivation" of Brian B.'s liberty (a causation analysis), or whether the lapse of time was enough to minimize any special relationship created by the defendants' conduct (a duty analysis), the result is the same. For there to be a violation of the fourteenth amendment and a claim under section 1983, the state must be more directly implicated that it was here in the events causing the victim's injury.

In every case where a duty to protect was imposed because the state affirmatively acted to place a particular individual in a dangerous position, the danger was *imminent*. If Louis C.'s attack had come a few weeks or even months after his placement in the CBI program, the plaintiff might have a stronger case for the existence of a duty to protect. The violent encounter in this case, however, occurred at least two years after the DHS and Centers defendants acted to place Louis C. in the program. The significant lapse of time between the state's act in placing Louis C. in the program and the attack on Brian B. suggests that the attack "was independently conceived and executed, and the state neither condoned nor encouraged [such] behavior." *Estate of Gilmore*, 787 F.2d at 722.

Louis C. was not a convicted criminal who had been released, paroled, or had escaped. He was a foster child. This, of course, does not excuse his violent behavior. However, there is a difference between putting a known criminal on the doorstep of an unsuspecting citizen who is murdered by that criminal a few hours later and placing a foster child into an educational program with other students, one of whom is attacked by the foster child two years later. In addition, the custody and control the state had over Louis C. was of much lesser degree than the state exercises over incarcerated or furloughed prisoners.

Given these factors, this case is much closer to *Martinez, Estate of Gilmore,* and *Jones* than to *Wells*. Because there was no special relationship of constitutional dimensions between Brian B. and the state, and because the state's conduct was too remote under *Martinez*, the Court finds that the complaint fails to make out a violation of the Due Process Clause by the DHS and The Centers defendants.

■ The LRSD defendants, in contrast, did not have legal custody or control over Louis C. and therefore were not responsible for the decision to place him in the CBI program or for his ongoing supervision. The plaintiff alleges that the LRSD defendants are liable because they also knew of Louis C.'s propensity for assaultive conduct, but left Louis C. and Brian B. alone unsupervised. Absent the LRSD defendants' control over the placement of Louis C. in the program or a sufficiently custodial environment at school, the cir-

cumstances here appear closer to *DeShaney* and those cases in which courts have refused to extend a duty under the Due Process Clause for the failure to act, even when the state is aware of a person's dangerous predicament. *See DeShaney*, 489 U.S. at 200, 109 S.Ct. at 1006 ("[t]he affirmative duty to protect arises not from the State's knowledge of the individual's predicament"). *See also Losinski v. County of Tremplealeau*, 946 F.2d 544 (7th Cir. 1991) (civil rights violation did not occur when woman was killed by her husband in presence of deputy sheriff who had accompanied victim to trailer to retrieve her belongings); *McKee v. City of Rockwall, Texas*, 877 F.2d 409 (5th Cir.1989), *cert. denied*, 493 U.S. 1023, 110 S.Ct. 727, 107 L.Ed.2d 746 (1990) (no constitutional claim for injury woman suffered after police failed to make arrest at a domestic assault call); *Tucker v. Callahan*, 867 F.2d 909 (6th Cir.1989) (*DeShaney* bars suit against police officer who watched individual being beaten, but took no action); *Archie v. City of Racine*, 847 F.2d 1211 (7th Cir.1988) (en banc) (dispatcher could not be held liable for failure to send fire department rescue squad to respond promptly to a person with breathing difficulties who subsequently died).

This admittedly is a fine distinction. One could argue that leaving Louis C. alone with Brian B. was itself an affirmative act which rendered Brian B. more vulnerable to harm. But the same could be said about the defendants in *DeShaney* or the other cases just cited. The LRSD defendants were not responsible for Louis C.'s placement in the program which resulted in the two boys being in close proximity to one another, nor did they affirmatively interfere with the protections that otherwise were available to Brian B. They did not place Brian B. in a position of danger; they simply failed to protect Brian B. from a student they supposedly knew to be dangerous. That failure may be actionable under the law of the State of Arkansas—indeed, "[i]t is monstrous if the state fails to protect its residents against such predators," *Bowers*, 686 F.2d at 618—but it does not violate the Due Process Clause of the Fourteenth Amendment. "The Constitution is a charter of negative liberties; it tells the state to let people alone; it does not require the federal government or the state to provide services, even so elementary a service as maintaining law and order." *Id.*

The Court therefore finds that allegations in the plaintiff's complaint are insufficient to state a claim that the LRSD defendants owed Brian B. a duty to protect him from the attack by Louis C. To hold otherwise would impose on schools officials an affirmative duty under the Due Process Clause to constantly supervise and protect schoolchildren against *any* student known to be dangerous while that student is on school grounds. This is a matter best left to state law.

The Court expresses no view on the plaintiff's rights under the tort law of Arkansas. A state may choose to create positive duties of care and protection and make the breach of those duties tortious. But the only duties of care that may be enforced in suits under section 1983 are duties founded on the Constitution or laws of the United States. And, absent a special relationship, the duty to protect against harm from private individuals is not among them.

### VI.

■ Even if the Court were to conclude that a constitutional duty to protect exists based on the alleged facts, the defendants likely would prevail by virtue of qualified immunity. *See Hilliard v. City & County of Denver*, 930 F.2d 1516, 1519–21 (10th Cir.1991); *Reeves ex. rel. Jones v. Besonen*, 754 F.Supp. 1135, 1141–42 (E.D.Mich.1991). Qualified immunity exists where the defendants' actions do not violate clearly established constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039,

97 L.Ed.2d 523 (1987). While the specific action at issue need not have been previously held unlawful, the alleged unlawfulness must be "apparent" in light of preexisting law. *Id.* In determining whether the law involved was clearly established, the court examines the law as it was at the time of the defendants' actions. The foregoing discussion shows that the law concerning the duty to protect from private violence was not clearly established at the time the defendants placed Louis C. in the CBI program or at the time the attack occurred in 1989.[12]

Because the Court finds that the plaintiff's allegations, if taken as true, do not implicate a right protected by the Due Process Clause, the Court need not address whether the plaintiff adequately has alleged that the DHS and Centers defendants' conduct deprived the plaintiffs of that right within the meaning of the Due Process Clause. This inquiry, of course, would require consideration of the "state of mind" with which the defendants are charged. *See Daniels v. Williams,* 474 U.S. 327, 334 n. 3, 106 S.Ct. 662, 666 n. 3, 88 L.Ed.2d 662 (1986). Similarly, it is unnecessary to decide the issues related to the sufficiency of the claims against particular individual defendants, whether the Centers defendants were state actors, the specificity of the complaint, or whether Dorothy J. can sue in her individual capacity.

The plaintiff also has a motion pending for leave to file an amended complaint. The Court has reviewed the proposed amended complaint and finds that it simply clarifies and puts into proper form the plaintiff's supplemental state tort claims, as well as adding another party for purposes of those claims. It does not otherwise change the allegations under section 1983. Since the Court is dismissing the plaintiff's section 1983 claims, whatever supplemental tort claims that may have been stated in the original complaint also are dismissed without prejudice. *See* 28 U.S.C. § 1367(c)(3).

It may well be that the defendants were negligent under state tort law for failing to protect Brian B. from Louis C.'s attack. But not "all common-law duties owed by government actors were ... constitutionalized by the Fourteenth Amendment." *Daniels,* 474 U.S. at 335, 106 S.Ct. at 667. The Court sympathizes with Dorothy J. and her son over the grievous harm they have suffered. Yet, it must be remembered that the harm was not inflicted by the state, but

---

**12.** There is a split among the circuits on the question of whether private actors, such as the Centers defendants here, may assert a qualified immunity defense after they are characterized as state actors in § 1983 lawsuits. The First Circuit and Ninth Circuits have held that private parties acting under color of state law are not entitled to such immunity. *See Downs v. Sawtelle,* 574 F.2d 1 (1st Cir.), *cert. denied,* 439 U.S. 910, 99 S.Ct. 278, 58 L.Ed.2d 255 (1978); *Conner v. Santa Ana,* 897 F.2d 1487, 1492 n. 9 (9th Cir.), *cert. denied,* 498 U.S. ——, 111 S.Ct. 59, 112 L.Ed.2d 34 (1990). The Sixth Circuit rejected qualified immunity for private individuals but recognized a "good faith" defense in *Duncan v. Peck,* 844 F.2d 1261 (6th Cir.1988).

The Fifth, Eighth, Tenth, and Eleventh Circuits have granted qualified immunity to private individuals in certain circumstances. *See Folsom Investment Co. v. Moore,* 681 F.2d 1032 (5th Cir. Unit A 1982); *Watertown Equipment Co. v. Norwest Bank Watertown,* 830 F.2d 1487 (8th Cir.1987), *cert. denied,* 486 U.S. 1001, 108 S.Ct. 1723, 100 L.Ed.2d 188 (1988); *Buller v. Buechler,* 706 F.2d 844 (8th Cir.1983); *DeVargas v. Mason & Hangar–Silsas Mason Co.,* 844 F.2d 714 (10th Cir.1988); *Jones v. Preuit & Mauldin,* 851 F.2d 1321 (11th Cir.1988) (en banc), *vacated on other grounds,* 489 U.S. 1002, 109 S.Ct. 1105, 103 L.Ed.2d 170 (1989).

This is mostly academic because in *Wyatt v. Cole,* —— U.S. ——, 112 S.Ct. 1827, 118 L.Ed.2d 504 (1992), the Supreme Court held that qualified immunity is not available for private defendants faced with § 1983 liability for invoking a state replevin, garnishment, or attachment statute. The Court, however, did not foreclose the possibility that private defendants faced with § 1983 liability under *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 937, 102 S.Ct. 2744, 2753–2754, 73 L.Ed.2d 482 (1982) (private defendants invoking aid of state officials to carry out state-created attachment scheme were "willful participant[s] in joint activity with the State or its agents"), could be entitled to an affirmative defense based on good faith and/or probable cause or that § 1983 suits against private parties, rather than governmental officials, could require plaintiffs to carry additional burdens. Despite the narrow holding, the Court's rationale probably would support the unavailability of qualified immunity to the Centers defendants in this case.

by another student. The government's connection with Louis C.'s alleged violent attack simply is too remote and unrelated to hold it liable under the Fourteenth Amendment.

The defendants' motions to dismiss are granted.

IT IS SO ORDERED.